**FIRST AMERICAN TITLE INSURANCE COMPANY and Old Republic National Title Insurance Company, Petitioners,**

v.

**Susan COMBS, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of Texas, Respondents.**

No. 05–0541.

Supreme Court of Texas.

Argued April 11, 2007.

Decided May 16, 2008.

Rehearing Denied Aug. 29, 2008.

Ron K. Eudy, Patricia Otto, Sneed, Vine & Perry, P.C., Thomas R. Phillips, Kennon Lathem Peterson, Baker Botts, LLP, Austin, TX, Matthew J. Zinn, Steven Reed, Steptoe & Johnson, LLP, Robert K. Kry, Baker Blott, LLP, Washington, DC, for Petitioners.

Christine Monzingo, Office of the Attorney General of Texas-Taxation Division, Greg Abbott, Attorney General of Texas, Barry Ross McBee, Edward D. Burbach, Office of the Attorney General, William E. Storie, Office of the Attorney General-Taxation Dept., Kent C. Sullivan, Fisrt Assistant Attorney General, David S. Morales,

Office of the Attorney General of Texas, Austin, TX, for Respondents.

Catherine B. Fryer, Bickerstaff Heath Pollan & Caroom, LLP, Caroline Scott, Gardere Wynne Sewell LLP, Austin, TX, for Amicus Curiae.

Justice WILLETT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice O'NEILL, Justice GREEN, and Justice JOHNSON joined.

For over a century, Texas has taxed the premiums collected on title insurance policies sold here.[1] For almost as long, Texas has imposed an additional "retaliatory" tax when necessary to equalize the tax burdens borne by Texas and foreign-based title insurance companies.[2] This system has operated with minimal change until a few years ago when the Comptroller reinterpreted the retaliatory tax statute in a way that sharply increased the tax liability of certain non-Texas title insurers.

Two of those foreign insurers challenge the Comptroller's revised interpretation,[3] arguing that it contravenes the plain meaning of the controlling statutes and violates the insurers' equal protection rights under the United States and Texas Constitutions. We disagree and, accordingly, affirm the court of appeals' judgment.

## I. Background

First American Title Insurance Company (First American) and Old Republic National Title Insurance Company (Old Republic) are out-of-state title insurance companies doing business in Texas. First American is California-based and issues Texas policies directly and also through independent agents; Old Republic is Minnesota-based and issues policies in Texas only through independent agents. Title agents are distinct business entities, usually corporations or limited liability companies, that engage in title insurance work independent of title insurance companies.

The Texas Department of Insurance (TDI) prescribes the premium that insurers may charge policyholders for title insurance.[4] When a title insurer issues policies through an independent agent, TDI also prescribes how the insurance company

---

1. *See, e.g.,* Act approved May 13, 1905, 29th Leg., 1st C.S., ch. 6, § 1, 1905 Tex. Gen. Laws 427, 427–28 (amending an earlier statute by specifically including title insurance companies in the premium tax scheme).

2. *See* Act of May 2, 1935, 44th Leg., R.S., ch. 307, § 1, 1935 Tex. Gen. Laws 713, 713–14, *repealed by* Act of May 23, 1951, 52nd Leg., R.S., ch. 491, § 4, 1951 Tex. Gen. Laws 868, 1093.

3. The original Respondent to this appeal was the predecessor to the present Comptroller. As the former Comptroller left office before this appeal was disposed of, "the public officer's successor is automatically substituted." Tex.R.App.P. 7.2(a).

4. Act of June 7, 1951, 52nd Leg., R.S., ch. 491, § 1, art. 9.03, 1951 Tex. Gen. Laws 868, 970–71, *amended by* Act of June 7, 1955, 54th Leg., R.S., ch. 489, § 3, 1955 Tex. Gen. Laws

1223, 1224–25, *amended by* Act of May 4, 1967, 60th Leg., R.S., ch. 219, § 1, art. 9.07, 1967 Tex. Gen. Laws 490, 493–94, *amended by* Act of May 31, 1975, 64th Leg., R.S., ch. 409, § 4, 1975 Tex. Gen. Laws 1063, 1065–67, *amended by* Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 6, 1987 Tex. Gen. Laws 3610, 3627–28, *amended by* Act of May 30, 1993, 73rd Leg., R.S., ch. 685, § 16.02, art. 9.07, 1993 Tex. Gen. Laws 2559, 2677–78, *amended by* Act of May 7, 1995, 74th Leg., R.S., ch. 127, § 6, 1995 Tex. Gen. Laws 949, 949–51, *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(b)(4), 2003 Tex. Gen. Laws 3611, 4139 (current version at Tex. Ins.Code § 2703.151(a)). Although the relevant statutes have since been recodified, we will refer to them as they were written from 2001 to 2002, the tax years in controversy here.

and the agent should divide the premium.[5] During the period relevant to this case, TDI allowed agents to keep 85% of premiums collected from policyholders and remit the remaining 15% to the insurer.[6] Texas insurance law subjects the full amount of the premium to a premium tax;[7] for logistical simplicity, the title insurers remit the full amount of tax on these premiums to the State.[8] All title insurance companies operating within the State, Texas-based or not, are subject to the premium tax.[9]

Besides this premium tax, Texas also imposes a retaliatory tax on foreign title insurers like First American and Old Republic if their home states impose more burdensome taxes, fees, and other obligations on Texas title insurers selling insurance there than Texas imposes on foreign title insurers selling insurance here.[10] The "principal purpose" behind retaliatory taxes, as the United States Supreme Court explained when it upheld their constitutionality, "is to promote the interstate business of domestic insurers by deterring other States from enacting discriminatory or excessive taxes" against foreign insurance companies.[11] Retaliatory taxes are ubiquitous, having "been a common feature of insurance taxation for over a century,"[12] and they exist in every state except Hawaii.[13]

**5.** Act of May 4, 1967, 60th Leg., R.S., ch. 219, § 1, art. 9.30, 1967 Tex. Gen. Laws 490, 504, *amended by* Act of May 31, 1975, 64th Leg., R.S., ch. 409, § 12, 1975 Tex. Gen. Laws 1063, 1069–70, *amended by* Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 8, art. 9.30, 1987 Tex. Gen. Laws 3610, 3630–31, *amended by* Act of May 7, 1995, 74th Leg., R.S., ch. 127, § 11, 1995 Tex. Gen. Laws 949, 952, *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(b)(4), 2003 Tex. Gen. Laws 3611, 4139 (current version at TEX. INS. CODE § 2502.054(b)(1)).

**6.** 28 TEX. ADMIN. CODE § 9.1 (adopting Basic Manual of Rules, Rates, and Forms for the Writing of Title Insurance in Texas, which is available at http://www.tdi.state.tx.us/title/titlem4d.html# P–23 and specifies a 15/85 split of the premium between insurer and agent).

**7.** Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 22, art. 9.59, 1987 Tex. Gen. Laws 3610, 3638–39, *amended by* Act of May 30, 1993, 73rd Leg., R.S., ch. 685, § 3.19, 1993 Tex. Gen. Laws 2559, 2591, *amended by* Act of May 22, 1997, 75th Leg., R.S., ch. 1423, § 11.35, 1997 Tex. Gen. Laws 5329, 5390, *amended by* Act of May 20, 1999, 76th Leg., R.S., ch. 852, § 3, 1999 Tex. Gen. Laws 3520, 3521, *amended by* Act of May 26, 2001, 77th Leg., R.S., ch. 763, § 4, 2001 Tex. Gen. Laws 1501, 1502–03, *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(b)(4), 2003 Tex. Gen. Laws 3611, 4139 (current version at TEX. INS.CODE §§ 223.001–.011) [hereinafter Former TEX. INS.CODE art. 9.59].

**8.** Former TEX. INS.CODE art. 9.59, § 8(b).

**9.** § 1.

**10.** Act of May 22, 1957, 55th Leg., R.S., ch. 396, § 1, 1957 Tex. Gen. Laws 1184, 1184–85, *amended by* Act of May 30, 1983, 68th Leg., R.S., ch. 622, § 16, 1983 Tex. Gen. Laws 3891, 3929–31, *amended by* Act of July 3, 1984, 68th Leg., 2nd C.S., ch. 31, Art. 4, § 5, 1984 Tex. Gen. Laws 193, 221, *amended by* Act of May 28, 1989, 71st Leg., R.S., ch. 237, § 3, 1989 Tex. Gen. Laws 1102, 1106, *amended by* Act of May 22, 1989, 71st Leg, R.S., ch. 242, § 6, 1989 Tex. Gen. Laws 1151, 1154, *amended by* Act of May 18, 1995, 74th Leg., R.S., ch. 279, § 9, 1995 Tex. Gen. Laws 2619, 2622, *amended by* Act of May 20, 1999, 76th Leg., R.S., ch. 852, § 4, 1999 Tex. Gen. Laws 3520, 3521–22, *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (current version at TEX. INS.CODE §§ 281.001–.007) [hereinafter Former TEX. INS.CODE art. 21.46].

**11.** *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 668, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981).

**12.** *Id.*

**13.** *See* HAW.REV.STAT. § 431:7–206 (granting domestic insurance companies a tax credit for the amount of retaliatory tax paid to other states); *Prudential Ins. Co. of Am. v. Comm'r of Revenue*, 429 Mass. 560, 709 N.E.2d 1096, 1098, 1100 n. 7 (1999).

First American and Old Republic remitted premium and retaliatory taxes to the Comptroller, calculating the retaliatory tax owed based on the full amount of premium taxes they remitted to the State. Thus, they included not only the premium tax paid on the 15% of the premium they earned but also the premium tax paid on the 85% of the premium earned by independent agents. However, in 1996 the Comptroller adopted a new rule that recognized the agent's responsibility for "taxes due on the agent's portion of the premium."[14] This change resulted in a new method of calculating the retaliatory tax. The Comptroller reasoned that because title insurers keep only 15% of premiums collected on agent-issued policies and pay only 15% of the premium tax—despite remitting the entire 100% to the State—foreign title insurers could count only that 15% when figuring the amount of retaliatory tax owed. The result of this new math: the foreign insurers' premium tax liability dropped compared with what other states imposed on Texas insurers, thus substantially increasing the foreign insurers' retaliatory tax liability.

The Comptroller's interpretive change required First American to pay an extra $1,432,580.76 in retaliatory taxes and interest for tax years 2001 and 2002, which First American paid under protest. Old Republic paid a total of $219,626.40 in retaliatory taxes for tax year 2002 based on the new method, also under protest. The insurers then filed separate lawsuits in district court to recover the excess tax payments incurred as a result of the Comptroller's new interpretation of the retaliatory tax statute. In each case, the insurer and the Comptroller filed cross-motions for summary judgment; in each case, the trial judge awarded summary judgment to the Comptroller without elaboration. Both insurers appealed; their appeals were consolidated; and the court of appeals affirmed, holding that the Comptroller's revised interpretation of the statutes was reasonable and constitutional.[15]

## II. Standard of Review

The insurers argue the Comptroller's interpretive change offends the plain meaning of the relevant Insurance Code provisions and also violates the equal protection clauses of the United States and Texas Constitutions. Since "cases should be decided on narrow, non-constitutional grounds whenever possible,"[16] we begin with the statutory claim, examining the statutes as they existed in tax years 2001–02, the time of this dispute.

 The construction of a statute is a question of law we review de novo.[17] When interpreting a statute, we look first and foremost to the plain meaning of the words used.[18] "If the statute is clear and unambiguous, we must apply its words according to their common meaning"[19] in a way that gives effect to every word, clause, and sentence.[20] And ordinarily, when di-

14. 21 Tex. Reg. 838 (1996), *adopted* 21 Tex. Reg. 3948 (1996) (codified at 34 Tex. Admin. Code § 3.831(3)(B)) (current version at 34 Tex. Admin. Code § 3.831(4)(B)).

15. 169 S.W.3d 298, 302–03, 313.

16. *VanDevender v. Woods*, 222 S.W.3d 430, 433 (Tex.2007).

17. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex.2006).

18. *Id.*

19. *Id.*

20. *City of Marshall v. City of Uncertain*, 206 S.W.3d 97, 105 (Tex.2006) (quoting *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 29 (Tex.2003)).

vining legislative intent, "the truest manifestation" of what lawmakers intended is what they enacted, "the literal text they voted on."[21]

■ The insurers argue that, because the retaliatory tax provision is "penal" in nature, we should strictly interpret its language and resolve any ambiguities against the Comptroller. The Supreme Court has cast doubt on whether retaliatory taxes are penal in nature: "the principal purpose of retaliatory tax laws is to promote the interstate business of domestic insurers ... 'their ultimate object is not to punish foreign corporations doing business in the state.' "[22] Furthermore, although we have applied "a stricter construction" to tax statutes in the past, we have done so only when "doubt about [the statute's] application still remains after dominant rules of construction have been applied."[23] One of those "dominant rules of construction" requires us to give "serious consideration" to the "[c]onstruction of a statute by the administrative agency charged with its enforcement."[24] The retaliatory tax statute states that "the comptroller shall impose" the retaliatory tax.[25] The premium tax statute provides that "the commissioner or comptroller, as appropriate, may adopt rules, regulations, minimum standards, and limitations that are fair and reasonable as may be appropriate for the augmentation and implementation of this article."[26] Because the Legislature charged the Comptroller with enforcement of these statutes, we will uphold her interpretation "so long as the construction is reasonable and does not contradict the plain language of the statute."[27]

## III. Discussion

First American and Old Republic contend that the Comptroller's interpretation of the retaliatory tax scheme improperly excludes a portion of the premium tax that they are obligated to pay under the premium tax provision, ultimately resulting in artificially high retaliatory taxes. Article 21.46 of the Insurance Code—the retaliatory tax provision operative at the time this dispute arose—requires the Comptroller to impose a retaliatory tax on an out-of-state insurance company when the financial burden imposed on Texas insurers by a foreign state exceeds the aggregate of taxes and other obligations "directly imposed" on foreign insurers by Texas.[28] The parties agree that the principal obligation "directly imposed" on title insurers in Texas is the premium tax.

### A. The Premium Tax Provision

Article 9.59 of the Insurance Code requires that "[e]ach title insurance company receiving premiums from the business of title insurance shall pay to the comptroller a tax on those premiums as provided in

21. *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 651 (Tex.2006).

22. *W. & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) (quoting P.H. Vartanian, Annotation, *Constitutionality, Construction, Operation, and Effect of Retaliatory Statutes Against Foreign Corporations Doing Business Within State,* 91 A.L.R. Ann. 795 (1934)).

23. *Calvert v. Tex. Pipe Line Co.,* 517 S.W.2d 777, 781 (Tex.1974).

24. *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993).

25. Former TEX. INS.CODE art. 21.46, § 1(a).

26. Former TEX. INS.CODE art. 9.59, § 3(c).

27. *Tarrant Appraisal Dist.,* 845 S.W.2d at 823.

28. Former TEX. INS.CODE art. 21.46, § 1(a).

this article."[29] This tax applies to "all amounts defined to be premium in this Chapter, whether paid to the title insurance company or retained by the title insurance agent."[30] The Chapter defines a premium as "the total amount of premiums received for the taxable year on title insurance written on property located in this state."[31] Title insurers doing business in Texas are required to file an annual tax return and remit the total amount of tax due directly to the Comptroller.[32] Title insurance agents do not file returns or pay premium taxes directly:

> The State of Texas facilitates the collection of the premium tax on the premium retained by the agent by setting the division of the premium between insurer and agent so that the insurer receives the premium tax due on the agent's portion of the premium and remits it to the State.[33]

The parties agree that Article 9.59 taxes all premiums earned from the provision of title insurance, whether earned by an insurance company or an insurance agent, but the parties disagree on whom the tax is imposed. The insurers argue that they are the only parties obligated by Article 9.59 to pay the premium tax, so the full amount of their payment should be included in the retaliatory tax calculation. The Comptroller responds that although the insurance company remits the entire premium tax, the insurer merely acts as a conduit for 85% of the premium tax, which is actually paid by the insurance agent. According to the Comptroller, because the

insurance company remits 85% of the premium tax to the State as an administrative mechanism and in economic reality bears only 15% of the tax burden, the insurer can only include 15% of the tax in its calculation of taxes "directly imposed." Thus, the dispute hinges on whether the full premium tax is "directly imposed" on title insurance companies under the retaliatory tax provision.

The Comptroller's application of the premium tax to insurance agents is reasonable and in harmony with the statute's plain meaning. As the insurers point out, Article 9.59 requires the insurance company, not the insurance agent, to report[34] and pay[35] the premium tax on all premiums earned from the provision of title insurance.[36] But the statute also recognizes that agents receive premiums, and it explicitly taxes those premiums: "The premium tax is levied on *all* amounts defined to be premium in this Chapter, whether paid to the title insurance company or retained by the title insurance agent."[37]

■ Nevertheless, the insurers contend that the premium tax, while applied to all premiums earned, is not imposed on the agent because "[t]he premium tax is levied on all amounts defined to be premium . . . such tax being in lieu of the tax on the premium retained by the agent."[38] Taken in isolation, this phrase arguably exempts insurance agents from paying the premium tax. But the full context of Subsection 8(b) yields a different understanding. The very next sentence provides that the State

29. Former Tex. Ins. Code art. 9.59, § 1.

30. § 8(b).

31. § 2.

32. §§ 5, 8(b).

33. § 8(b).

34. § 5.

35. § 1.

36. § 2.

37. § 8(b) (emphasis added).

38. *Id.*

"facilitates the collection of the premium tax on the premium retained by the agent" by dividing the premium between insurer and agent "so that the insurer receives the premium tax due on the agent's portion of the premium." [39] The State would have no need to ensure that insurance companies receive the agent's portion of the premium tax if the tax were not imposed on the agents. Rather, "in lieu of" creating a separate tax collection system for insurance agents, the Legislature implemented an integrated system of taxation with the insurance company acting as the central collection point.[40] The premium tax applies to the premium earned by the agent, and Article 9.59 requires the agent to bear the burden for the agent's portion of the taxes: "the insurer receives the premium tax due on the agent's portion of the premium and remits it to the State." [41]

Article 9.59 describes the insurer's role as a pass-through entity relied on by the State to "facilitate[ ] the collection of the premium tax" [42] from the insurance agent.

At most, the only compulsion or obligation required of the insurer with regard to 85% of the premium tax is to write a check drawn on money remitted by the agent— at the end of the day, the insurer's bank account is not negatively impacted. This administrative burden of acting as a conduit for the agents' tax payments does not rise to the level of a "direct imposition" and therefore cannot be counted as a burden meriting inclusion in the retaliatory tax calculation.

## B. Penalties for Noncompliance with the Premium Tax Statute

However, the insurers point out that Article 9.59 requires more of title insurance companies than writing a check; the statute further states that "[a] title insurance company failing to pay all taxes imposed by this article is also subject to Article 4.05 of this code." [43] Article 4.05 requires insurance companies to pay their taxes prior to receiving a certificate of authority to do business in the state; the

---

39. *Id.*

40. This taxation system set up by the Legislature, whereby one party serves as a collection or transfer agent of a tax that is actually imposed on and paid by another, is not novel. Federal and state tax schemes abound with similar collection systems; for example, federal personal income taxes are imposed on individual employees, even though employers remit the bulk of these taxes to the government through the withholding mechanism and face liability for their failure to do so. *See* I.R.C. § 6672(a) (2006); *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 467, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (acknowledging the settled proposition that employees, not employers, bear the burden of income tax); *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 97 n. 6 (3d Cir.1994) ("[T]he theory of trust fund taxes (like income tax withholding) is that the tax is imposed on one party (for example, an employee), but is collected and held by another party (for example, the employer)." (quoting *In re Markos Gurnee P'ship*, 163 B.R. 124, 129 & n. 4

(Bkrtcy.N.D.Ill.1993) (internal quotation marks omitted))).

41. Former TEX. INS.CODE art. 9.59, § 8(b). The insurers argue that, in spite of the plain language of Subsection 8(b), insurance agents do not remit their portion of the premium tax to insurance companies. To support their contention, the insurers point to forms used by TDI in setting the premium division. The title insurer form lists 100% of the premium tax as an expense; the title agent form does not list premium tax at all. This argument does not persuade us. The title agent form does contain an expense line for the amount of premiums remitted to the title insurer, and the statutory language makes clear that the agent's portion of the premium tax is to be included in that remittance. Furthermore, TDI cannot override the plain language of the premium tax statute.

42. *Id.*

43. § 9.

statute also authorizes the Comptroller to institute a collection action against insurers that underreport gross premium receipts.[44] Thus, the insurers argue that even if insurance agents are taxed on their portion of premiums, insurers alone run the risk of Article 4.05 sanctions for failing to pay the full amount of the premium tax.

The Comptroller alleviated this risk by implementing new policies along with her new interpretation of the tax statutes. These policies allocate responsibility for nonpayment of premium taxes according to the respective tax burdens borne by insurance agents and insurance companies. In 2000, the Comptroller published a new policy making agents directly liable to the Comptroller if they fail to remit their portion of the premium tax to insurers. This understanding was further solidified in 2001, when the Comptroller added the following provision to Insurance Tax Rule 3.831:

> Title insurers and title agents are both subject to the premium and maintenance tax on their proportional share of the premiums and are separately liable for the tax if the insurer fails to remit the tax due on the agent's portion.[45]

Under this new rule, title insurers cannot be held liable for nonpayment of the agent's portion of the premium tax—insurers will face statutory consequences only if they fail to remit their own portion of the premium tax.

The insurers argue that Rule 3.831 contradicts Section 1 of Article 9.59, which requires insurance companies to pay the premium tax, and Section 2 of Article 9.59, which clarifies that the premium tax applies to all premiums earned. Contrary to the insurers' claims, Rule 3.831 does not alter the payment mechanism set up by Article 9.59; under the plain terms of the Rule, separate liability applies "if the insurer fails to remit the tax due on the agent's portion." [46] Thus, Rule 3.831 comports with Article 9.59—the insurer remits the premium tax for both the insurer and the agent—while clarifying that each party will be held liable only for the portion of premium tax that it owes.

## C. The Retaliatory Tax Provision

Nevertheless, the insurers contend that even if the full amount of the premium tax is not "directly imposed" on them, the Comptroller's interpretation must still fail because it conflicts with various portions of the retaliatory tax provision.

The retaliatory tax provision operative at the time this dispute arose, Article 21.46 of the Insurance Code, allows the Comptroller to impose a retaliatory tax on an out-of-state insurer

> [w]henever by the laws of any other state or territory of the United States any taxes, ... licenses, fees, fines, penalties, deposit requirements or other obligations, prohibitions or restrictions are imposed upon any insurance company that is organized in this State and licensed and is doing business or that may do business in such other state or territory which, in the aggregate are in excess of the aggregate of the taxes, ... licenses, fees, fines, penalties, deposit requirements or other obligations, prohibitions or restrictions *directly imposed*

---

**44.** Act of June 7, 1951, 52nd Leg., R.S., ch. 491, § 1, art. 4.05, 1951 Tex. Gen. Laws 868, 923, *amended by* Act of May 30, 1993, 73rd Leg., R.S., ch. 685, Art. 3, § 3.10, art. 4.05, 1993 Tex. Gen. Laws 2559, 2581, *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (current version at Tex. Ins.Code § 203.002).

**45.** 34 Tex. Admin. Code § 3.831(4)(C).

**46.** *Id.*

upon a similar insurance company of such other state or territory doing business in this State.... [47]

The insurers argue that the retaliatory tax provision does not just require insurance companies to compare the taxes imposed by Texas and their home states, the provision also requires them to compare "other obligations ... directly imposed" by this State.[48] According to the insurers, the Comptroller does not give them credit for all of the burdens they bear; namely, the Comptroller excludes from consideration the obligation to report[49] and remit[50] the full amount of the premium tax to the State.

■ The last clause of Subsection (a) provides a clearer context for the meaning of "other obligations": "the aggregate of taxes, licenses, fees, fines, penalties or other obligations imposed by this State pursuant to this Article ... shall not exceed the aggregate of *such charges* imposed by such other state."[51] Here, the Legislature replaced the laundry list of taxes, fees, and other obligations with the words "such charges," indicating that the "other obligations" meant to be included in the retaliatory tax calculations are financial charges "directly imposed" on title insurers. Thus, the administrative responsibilities of filling out forms and remitting the

full premium tax do not qualify as "other obligations" under Article 21.46.[52]

### D. A Response to the Dissent

The insurers' arguments center on one underlying theme: the Comptroller's interpretation improperly credits foreign title insurers with a lower premium tax payment (15%) than what they actually pay (100%), which results in an improperly high retaliatory tax burden. The dissent frames the issue differently: the Comptroller's interpretation "compare[s] other states' taxes on total premiums with Texas' tax on only the insurer's 15% share," resulting in an unfair comparison "as equal as 15 is to 100."[53] The dissent's argument is premised on an understanding that the retaliatory tax scheme was originally based on a comparison of "the taxes on total premiums" imposed by Texas and other states, and that the retaliatory tax is only fair if it takes into consideration the burdens placed "on the insurance industry"—both the insurer and associated agents.[54] Comparing the tax burden imposed on the entire title insurance industry in Texas and a hypothetical other state, the dissent concludes that the Comptroller has artificially lowered the effective premium tax rate in a way that ensures that all foreign insurers will pay retaliatory taxes, thus generating additional revenue for the State.[55]

---

**47.** Former Tex. Ins.Code art. 21.46, § 1(a) (emphasis added).

**48.** *Id.*

**49.** Former Tex. Ins.Code art. 9.59, § 5.

**50.** §§ 1, 8(b).

**51.** Former Tex. Ins.Code art. 21.46, § 1(a) (emphasis added).

**52.** The insurers also argue that the Comptroller's new interpretation of the retaliatory tax scheme violates the express mandate of Article 21.46 because the total taxes on premiums

earned by foreign title insurers operating in Texas exceeds the total taxes on premiums earned by Texas title insurers operating elsewhere. This argument depends upon an interpretation of Article 9.59 that credits the insurers 100% of the premium tax payment. Having rejected that interpretation of Article 9.59, we also reject this argument.

**53.** 258 S.W.3d at 646.

**54.** *Id.*

**55.** The dissent's hypothetical compares two similarly situated insurers earning $1,000 in title premiums. The Texas insurer operating

We cannot agree with the dissent's portrayal of the retaliatory tax scheme because it fails to comport with the express language of the retaliatory tax statute. The dissent accuses us of employing a "myopic" view of the statute that gives credence to an "artificial allocation" of the premium tax burden based on payor,[56] but Article 21.46 is clear: the payor matters. The dissent's assertion that "[t]his tax was based on the burden imposed ... on the insurance industry" ignores the statute's plain language.[57] The "relatively unchanged"[58] language of the retaliatory tax statute instructs the Comptroller to compare the tax burdens "imposed upon any *insurance company*" from Texas operating elsewhere with the tax burdens "directly imposed upon a similar *insurance company*" from elsewhere operating in Texas.[59] If a Texas insurer operating outside the state bears a heavier tax burden under this comparison, then the Comptroller "shall impose" a retaliatory tax "upon ... any similar *company*" so long as the taxes imposed by Texas "on an *insurance company*" from out-of-state do not exceed the taxes imposed by another state "on a similar *insurance company*" from Texas.[60] Thus, the retaliatory tax is imposed only on insurers based only on the other tax burdens borne by insurers. The Comptroller does not, and cannot, compare the taxes on total premiums, take into consideration the taxes paid by agents, or look to the burden borne by the industry as a whole because the Legislature set the focus of the retaliatory tax scheme on a single entity—the insurance company.

Once we employ the same focus dictated by the Legislature—comparing the burdens borne only by title insurance companies—the dissent's numbers balance out. Under the dissent's hypothetical, a Texas insurer operating out-of-state pays $20 in premium taxes; the out-of-state insurer also pays $20–$2.03 of premium tax and $17.97 of retaliatory tax. Thus, the retaliatory tax fulfills its role as an equalizer between similarly situated title insurers. Furthermore, when we focus on the proper tax base—the foreign insurer's $150 premium—the effective premium tax rate remains 1.35%—the statutorily designated rate.[61] As for the $11.47 tax burden borne by the foreign agent, a Texas agent operating in Texas would pay the same amount of premium tax, and the foreign operations of either Texas or foreign agents are not at issue because Article 21.46 neither aggregates an agent's tax burdens nor imposes the retaliatory tax on agents. The dissent expresses concern that the Comptroller's interpretation of the tax scheme would impose retaliatory tax on an insurer from a state with a lower premium tax rate than Texas, but this concern is misplaced. Article 21.46 does not impose a tax based on comparative tax *rates;* it does so based on comparative tax *burdens.* If, as in the dissent's example, another state applies a lower tax rate to a larger tax base in a way that requires a Texas insurer to pay more total taxes, then the

in another state is subject to a 2% premium tax in that state, resulting in a $20 tax payment. The foreign insurer and foreign agent operating in Texas are subject to a 1.35% premium tax—the insurer pays $2.03 on its 15% share, and the agent pays $11.47 on its 85% share. The foreign insurer also pays $17.97 in retaliatory tax. 258 S.W.3d at 646.

56. 258 S.W.3d at 645.

57. *Id.*

58. *Id.*

59. Former Tex. Ins.Code art. 21.46, § 1(a) (emphasis added).

60. *Id.* (emphasis added).

61. Former Tex. Ins.Code art. 9.59, § 4.

retaliatory tax would properly apply to equalize the total taxes paid.

The dissent also argues that the Comptroller's interpretation fails to comply with the directive of Article 21.46 to impose the retaliatory tax "in the same manner and for the same purpose" as the taxes imposed on Texas insurers by foreign states. Specifically, the dissent asserts that the Comptroller's scheme compares the insurer's 15% premium tax burden in Texas with the full premium tax burden imposed in other states. The record flatly contradicts this assertion: the retaliatory tax worksheet filled out by First American provides for gross premiums earned, and then—recognizing that California, First American's home state, splits the premiums between insurers and agents—allows a reduction for "[p]remiums retained by underwritten title companies," what Texas would call title agents. Thus, the "[t]otal premiums subject to tax" are only those premiums retained by the title insurance company—precisely the "apples-to-apples" comparison the dissent calls for. Not all states split the tax burden between insurers and agents like Texas and California, but as we have already noted, Article 21.46 charges the Comptroller with assessing the retaliatory tax based on the burdens imposed on the insurer alone. If other states choose to impose the full premium tax on the insurer, then the Comptroller is not out-of-bounds—indeed she is only following the statutory mandate—by comparing that tax to the tax imposed on the insurer's 15% premium in Texas. The

Comptroller's current interpretation may represent a change from past practice, but it is squarely in line with the 1987 legislative amendments that first established the agent—insurer pass-through premium tax collection system, which is all we require.[62]

In sum, First American and Old Republic have failed to show that the full amount of the title insurance premium tax is "directly imposed" upon them for purposes of Article 21.46. The Comptroller's interpretation of the retaliatory tax scheme comports with the plain language of the premium and retaliatory tax provisions of the Insurance Code; therefore, we reject the insurers' statutory claim.

## IV. Equal Protection Rights

First American and Old Republic further argue that the Comptroller's interpretation of the retaliatory tax scheme violates their equal protection rights under the United States and Texas Constitutions. "[T]he federal analytical approach applies to equal protection challenges under the Texas Constitution,"[63] so resolution of the federal equal protection claim will also resolve the State equal protection claim. We conclude that the Comptroller's interpretation of the relevant statutes does not violate the insurers' equal protection rights.

The equal protection clause of the Fourteenth Amendment forbids a state from "deny[ing] to any person within its jurisdiction the equal protection of the

---

**62.** *See Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993); *Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 247, 249 (Tex. 1991) (upholding Comptroller's change in forty-two year franchise tax collection practice when change was in line with "the clear intent of the Legislature."). Nor is the change here as drastic as in *House of Lloyd.* The Comptroller's reinterpretation of the re-

taliatory tax scheme began less than ten years after the 1987 amendments to Article 9.59. *See* Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 22, 1987 Tex. Gen. Laws 3610, 3638–39 (amended 1993, 1997, 1999, 2001 and repealed 2003); supra note 13.

**63.** *Bell v. Low Income Women of Tex.,* 95 S.W.3d 253, 266 (Tex.2002).

laws."[64] However, the Supreme Court has recognized that "most laws differentiate in some fashion between classes of persons"; therefore, unless a classification "jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic," the law will be upheld as long as it is rationally related to a legitimate state interest.[65] This rational-basis review requires us to answer two questions: "(1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?"[66]

As we already noted, the Supreme Court previously upheld a retaliatory tax provision similar to Article 21.46, holding that the tax provision had a legitimate purpose of promoting "domestic industry by deterring barriers to interstate business."[67] The insurers argue that, unlike the California statute upheld by the Supreme Court, the Comptroller's application of the Texas retaliatory tax scheme neither promotes domestic title insurers nor deters foreign taxation; rather, the Texas law has the purpose and effect of raising revenue at the expense of foreign title insurers. To support their argument, the insurers point out that the Comptroller's new interpretation raises nearly three times more retaliatory tax revenue than the prior interpretation and taxes the 85% premium portion twice (once at the premium-tax stage and once at the retaliatory-tax stage). According to the insurers, these changes raise revenue but do not deter other states from taxing Texas-based insurers because foreign states would have to reduce premium tax rates by as much as 80% to match the premium tax burden imposed on insurers by Texas law as currently interpreted by the Comptroller. The insurers contend that other states will likely respond not by lowering premium tax rates but by counter-retaliating against Texas insurers.

■ We disagree that these effects necessarily demonstrate an impermissible purpose underlying the Comptroller's construction of the retaliatory tax scheme. The Comptroller did not develop this scheme independently as a revenue-raising plan; as we have already discussed, the Comptroller's interpretation is consistent with the statutory scheme developed by the Legislature. Furthermore, the Comptroller's construction of the retaliatory tax system does not impermissibly discriminate against foreign title insurers. All title insurers operating in Texas, whether domestic or foreign, are subject to the 85/15 premium tax division. Moreover, foreign title insurers are not taxed merely because they are foreign; they are taxed only if their home states impose higher financial obligations on Texas insurers than Texas imposes on foreign insurers. The Comptroller's application of the retaliatory tax scheme may result in an increase in retaliatory taxes collected, but the increase depends just as much on premium tax rates charged by other states as it does on the Comptroller crediting title insurers with only 15% of the total premium tax payment. Therefore, the Comptroller's interpretation exerts some downward pressure on foreign tax rates, regardless of how other states choose to respond. The Comptroller's

64. U.S. Const. amend. XIV, § 1.

65. *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).

66. *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 668, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981).

67. *Id.* at 671, 101 S.Ct. 2070.

implementation of the retaliatory tax scheme may have unforeseen or unintended results, but "the courts are not empowered to second-guess the wisdom of state policies. Our review is confined to the *legitimacy* of the purpose." [68] The Comptroller's interpretation demonstrates a legitimate state purpose of protecting Texas title insurers by pressuring other states to keep their premium taxes low.

As for the second prong of equal protection analysis, the challenged interpretation will survive "if we conclude that [the Comptroller] rationally could have believed that the retaliatory tax would promote its objective." [69] The insurers do not challenge this point, and we have no trouble concluding that the Comptroller rationally could have believed that reducing the premium tax burdens Texas imposes on title insurers operating here would encourage other states to impose lower financial obligations on Texas title insurers operating elsewhere. The dissent disagrees, stating that "there is no rational basis for comparing 100% of another state's premium taxes with 15% of Texas' premium taxes," [70] but again, the correct comparison is between the taxes imposed on insurance companies, not insurance premiums or insurance industries. The equal protection clause guarantees that similarly situated persons—not similarly situated tax schemes or similarly situated industries—be treated

similarly. The Comptroller's interpretation of the retaliatory tax scheme equalizes the tax burdens borne by title insurers in a way that is rationally related to a legitimate state purpose; therefore, we reject the insurers' federal and state equal protection claims.

## V. Conclusion

The Comptroller implemented the premium and retaliatory tax provisions in a way that comports with the plain meaning of those statutes without offending the United States or Texas Constitutions. We therefore affirm the court of appeals' judgment.

Justice HECHT filed a dissenting opinion, in which Justice WAINWRIGHT, Justice BRISTER, and Justice MEDINA joined.

Justice HECHT, joined by Justice WAINWRIGHT, Justice BRISTER, and Justice MEDINA, dissenting.

Texas, like most other states,[1] taxes gross premiums for insurance of risks and property in the state,[2] and like every other state but Hawaii,[3] Texas imposes an additional retaliatory tax on out-of-state insurers doing business in Texas whose home states tax more heavily than Texas does, all other things being equal.[4] Such retaliatory taxes have been "a common feature of

**68.** *Id.* at 670, 101 S.Ct. 2070 (citation omitted).

**69.** *Id.* at 672, 101 S.Ct. 2070 (emphasis omitted).

**70.** 258 S.W.3d at 646.

**1.** CCH State Tax Guide, All States ¶ 88, at 9705 (2006) (stating that gross premiums taxes are "the most common form of insurance company tax" and are "imposed in every state upon some kind of insurance company").

**2.** Tex. Ins.Code §§ 221.001–228.007.

**3.** *Prudential Ins. Co. of Am. v. Comm'r of Rev.*, 429 Mass. 560, 709 N.E.2d 1096, 1098, 1099 n. 7 (1999).

**4.** Tex. Ins.Code § § 281.001–.052, *formerly* Tex. Ins.Code art. 21.46. The retaliatory provision compares not just premium taxes but "the sum of the taxes or other charges, prohibitions, and restrictions imposed" on an insurer. *Id.* §§ 281.004(a)(2) ("The comptroller shall impose and collect a tax or other charge or a prohibition or restriction on a foreign insurer authorized to engage in business in this state if . . . the sum of the taxes or other charges, prohibitions, and restrictions im-

insurance taxation for over a century",[5] and though they obviously impinge on interstate commerce, they do not implicate the "implied limitation on the power of the States to interfere with or impose burdens on interstate commerce" contained in the Commerce Clause of the United States Constitution because "Congress removed all Commerce Clause limitations on the authority of the States to regulate and tax the business of insurance when it passed the McCarran–Ferguson Act."[6] But the Fourteenth Amendment Equal Protection guaranty does not permit states to impose "more onerous taxes or other burdens on foreign corporations than those imposed on domestic corporations, unless the discrimination between foreign and domestic corporations bears a rational relation to a legitimate state purpose."[7] "[T]he principal purpose of retaliatory tax laws is to promote the interstate business of domestic insurers by deterring other States from enacting discriminatory or excessive taxes."[8] The United States Supreme Court has held that this purpose is legitimate and that a retaliatory tax rationally related to it does not violate Equal Protection.[9]

Texas' retaliatory tax, first enacted in 1935[10] and consistently applied until this

---

posed by that other state is more than the sum of the taxes or other charges, prohibitions, and restrictions that this state directly imposes on the foreign insurer."), 281.052 (providing for "a penalty or other obligation", under certain circumstances, to match the penalty or obligation imposed on a domestic insurer by the foreign insurer's state of organization). This case involves only taxes.

5. *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981).

6. *Id.* at 652–653, 101 S.Ct. 2070; *id.* at 654, 101 S.Ct. 2070 ("The Court has squarely rejected the argument that discriminatory state insurance taxes may be challenged under the Commerce Clause despite the McCarran–Ferguson Act." (citing *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 414, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946), and *Prudential Ins. Co. v. Hobbs,* 328 U.S. 822, 66 S.Ct. 1360, 90 L.Ed. 1602 (1946) (per curiam))).

7. *Id.* at 668, 101 S.Ct. 2070 (internal punctuation omitted).

8. *Id.*

9. *Id.* at 671–672, 101 S.Ct. 2070.

10. Act of May 2, 1935, 44th Leg., R.S., ch. 307, § 1, 1935 Tex. Gen. Laws 713, 713–714 ("Whenever, by any law in force without this State, an insurance corporation ... of this State or agent thereof is required to make any deposit of securities ... or to make payment for taxes, fines, penalties, certificates of authority, valuation of policies, license fees, or otherwise, or any special burden is imposed, greater than is required by the laws of this State for similar foreign corporations or their agents, the insurance companies ... of such States or governments shall be and they are hereby required as a condition precedent to their transacting business in this State, to make a like deposit for like purposes ... and to pay ... for taxes, fines, penalties, certificates of authority, valuation of policies, license fees and otherwise a rate equal to such charges and payments imposed by the laws of such other State upon similar corporations of this State and the agents thereof.") (amending former TEX.REV.CIV. STAT. art. 4758 (1925)), *repealed by* Act of May 28, 1945, 49th Leg., R.S., ch. 279, § 4, 1945 Tex. Gen. Laws 442, 445, *and by* Act of May 23, 1951, 52d Leg., R.S., ch. 491, § 4, 1951 Tex. Gen. Laws 868, 1093. The first retaliatory provision appears to have been enacted in 1909, but it referred only to different security deposit requirements in different states, not different taxes. Act approved Mar. 22, 1909, 31 st Leg., R.S., ch. 108, § 29, 1909 Tex. Gen. Laws 192, 203, *formerly* TEX.REV.CIV. STAT. art. 4768 (1911), *then* TEX.REV.CIV. STAT. art. 4758 (1925). the taxes on total premiums, not just the insurer's share. A few years ago, it is not clear exactly when, the Comptroller decided for the first time to compare other states' taxes on total premiums with Texas' tax on only the insurer's 15% share. Simply put, the Comptroller now takes the position that "total" means 100% in every other state and 15% in Texas.

case, falls squarely within the Supreme Court's holding. But in this case, the Comptroller has reinterpreted the statute as it applies to title insurers, multiplying the tax due and transforming it into a penalty on nonresident insurers doing business in Texas. This sudden departure from the settled application of the retaliatory tax was not prompted by any legislative revision of the statute or any change in retaliatory taxation in other states. The only apparent purpose for the Comptroller's new position is to generate revenue from nonresident title insurers simply because they are nonresident. In my view, the Comptroller has misconstrued the tax statute so that it now violates Equal Protection. Because the Court disagrees, I respectfully dissent.

When insurance is sold through an agent, the insurer and the agent share the premium revenue. For title insurance in Texas, the revenue division is set by the Commissioner of Insurance.[11] During the times material to this case, that division has been 15% to the insurer and 85% to the agent.[12] For decades, the retaliatory tax in Texas and other states has been determined by comparing

Ordinarily, everything is bigger in Texas, and though "total" is now smaller here, taxes have increased. The Comptroller's "new math", as the Court refers to it, multiplies the retaliatory tax and discrimi-

nates against out-of-state insurers doing business in Texas. For example, suppose an insurer from a state with a 2% premium tax rate does business in Texas, where the rate is 1.35%. On a $1,000 premium, the total tax would be $20 in the other state and $13.50 in Texas. Requiring the out-of-state insurer to pay a $6.50 retaliatory tax on its Texas business equalizes the tax burden on the two insurers' business in each other's state. Each insurer and its respective agents would, together, pay $20 in taxes and collect $980 in revenue. But in the Comptroller's view, the retaliatory tax is determined by the difference between the other state's $20 premium tax and the insurer's 15% share of Texas' $13.50 premium tax—$2.03—a difference of $17.97. Hence, the out-of-state insurer together with its respective agents pays $31.47 in taxes and collects $969.73 in revenue. The Comptroller's new math increases the out-of-state title insurer's tax burden merely because the insurer is out-of-state.

By artificially reducing the size of Texas' premium tax, the Comptroller's new position dictates that Texas impose retaliatory taxes even when insurers hail from states imposing lower premium taxes than Texas. Suppose an insurer from a state with a 1% premium tax does business in Texas. On a $1,000 premium, the Comptroller would compare the $2.03 insurer's share of the

---

**11.** Tex. Ins.Code § 2502.054(b)(1)(B) ("This subchapter does not ... prohibit a title insurance company from ... arranging for a division of premiums with the agent as set by the commissioner ...."), *formerly* Tex. Ins.Code art. 9.30, § B(1) ("This Article may not be construed as prohibiting ... a foreign or domestic title insurance company doing business in this state ... from ... making the arrangement for division of premiums with the agent as shall be set by the commissioner....").

**12.** *See* Basic Manual of Rules, Rates and Forms for the Writing of Title Insurance in the State of Texas § IV, P–23(f) ("During 2000, and thereafter until changed by the Commissioner, on all title insurance written by title insurance agents, the division of premiums between title insurance companies and title insurance agents shall be as follows: (1) title insurance companies shall receive 15% of each title insurance premium, and (2) title insurance agents shall receive 85% of each title insurance premium ...."), *adopted* 28 Tex. Admin. Code § 9. 1, *available at* http://www.tdi.state.tx.us/title/titlem4d.html# P–23.

Texas tax to the $10 premium tax in the other state and assess a $7.97 surcharge. In essence, for purposes of applying the retaliatory tax, the Comptroller has reduced Texas' gross premiums tax rate by 85%, from 1.35% to 0.2025%. Virtually every other state taxes gross premiums, but none has so low a rate. The tax now applies to all out-of-state insurers doing business in Texas merely because they are not domestic companies. The retaliatory tax, thus construed, no longer operates to discourage excessive taxation in other states; it now operates to discourage foreign insurers from doing business in Texas.

The Comptroller's change in position transforms the retaliatory tax, long a means of equalizing tax burdens on domestic and foreign insurers doing business in Texas, into a penalty against out-of-state insurers. The Comptroller's new position is not based on any change in the law. The relevant statutory provisions have been materially the same for decades. The retaliatory tax statute imposes "a tax ... on a foreign insurer if ... the foreign insurer's state of organization ... imposes a tax ... on a similar domestic insurer that is ... more than the [tax] this state directly imposes on the foreign insurer." [13] The retaliatory tax must be "impose[d] and collect[ed] ... in the same manner and for the same purpose" as the tax on the insurer in the other state.[14] These provisions, recodified in 2003,[15] were enacted in 1957 [16] and derived from the first retaliatory tax statute enacted in 1935.[17] The premium tax statute imposes a "tax ... on all premiums from the business of title insurance",[18] "regardless of whether paid to a title insurance company or retained by a

---

13. Tex. Ins.Code § 281.004(a) ("The comptroller shall impose and collect a tax or other charge or a prohibition or restriction on a foreign insurer authorized to engage in business in this state if: (1) the foreign insurer's state of organization by law imposes a tax or other charge or a prohibition or restriction on a similar domestic insurer that is or may be authorized to engage in business in that other state; and (2) the sum of the taxes or other charges, prohibitions, and restrictions imposed by that other state is more than the sum of the taxes or other charges, prohibitions, and restrictions that this state directly imposes on the foreign insurer.").

14. *Id.* § 281.004(b) ("The comptroller shall impose and collect the tax or other charge, prohibition, or restriction under Subsection (a) in the same manner and for the same purpose as the foreign insurer's state of organization.").

15. Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 1, 2003 Tex. Gen. Laws 3611, 3638–3641, 4138.

16. Act of May 22, 1957, 55th Leg., R.S., ch. 396, § 1, 1957 Tex. Gen. Laws 1184, 1185 ("Whenever by the laws of any other state or territory of the United States any taxes, licenses, fees, fines, penalties, deposit requirements or other obligations, prohibitions or restrictions are imposed upon any insurance company organized in this State and licensed and actually doing business in such other state or territory which, in the aggregate are in excess of the aggregate of taxes, licenses, fees, fines, penalties, deposit requirements or other obligations, prohibitions or restrictions directly imposed upon a similar insurance company of such other state or territory doing business in this State, the Board of Insurance Commissioners of this State shall impose upon any similar company of such state or territory in the same manner and for the same purpose, the same taxes, licenses, fees, fines, penalties, deposit requirements or other obligations, prohibitions or restrictions ...."), *formerly* Tex. Ins.Code art. 21.46.

17. *Supra* note 10.

18. Tex. Ins.Code § 223.003(a) ("An annual tax is imposed on all premiums from the business of title insurance. The rate of the tax is 1.35 percent of title insurance taxable premiums for a calendar year, including any premiums retained by a title insurance agent".).

title insurance agent",[19] to be paid by the insurer.[20] These provisions, also recodified in 2003,[21] and amended in 2007,[22] were enacted in 1987 [23] and derived from prior premium tax statutes, the first one dating to 1893.[24]

The Comptroller argues that the premium tax on the agent's 85% share of premiums is not "directly impose[d]" on the insurer within the meaning of the retaliatory tax statute, even though the insurer must remit the tax. In furtherance of its view, the Comptroller in 2001 adopted a rule limiting an insurer's liability for the premium tax to the amount due on its share.[25] The Comptroller acknowledges that no one took this position in the forty years after the phrase "directly imposes" was adopted in the 1957 statute, or in the ten years after the premium tax imposition and collection provisions were detailed in

19. *Id.* § 223.005(a) ("Premiums received from the business of title insurance are subject to the tax under this chapter regardless of whether paid to a title insurance company or retained by a title insurance agent, with the tax being in lieu of the tax on the premiums retained by a title insurance agent.").

20. *Id.* § 223.005(b) ("The state facilitates the collection of the premium tax on the premiums retained by a title insurance agent by establishing the division of the premiums between the title insurance company and title insurance agent so that the company receives the premium tax due on the agent's portion of the premiums and remits it to the state.").

21. Act of May 22, 2003, 78th Leg., ch. 1274, §§ 1, 26(b)(4), 2003 Tex. Gen. Laws 3611, 3622–3624, 4139.

22. Act of May 27, 2007, 80th Leg., R.S., ch. 932, § 3, 2007 Tex. Gen. Laws 3194, 3195 (amending Section 223.003(a), which previously read: "An annual tax is imposed on each title insurance company that receives premiums from the business of title insurance. The rate of the tax is 1.35 percent of the title insurance company's taxable premiums for a calendar year, including any premiums retained by a title insurance agent".).

23. Act of June 1, 1987, 70th Leg., R.S., ch. 1073, § 22, 1987 Tex. Gen. Laws 3610, 3638–3640, *formerly* Tex. Ins.Code art. 9.59 §§ 1 ("Each title insurance company receiving premiums from the business of title insurance shall pay ... an annual tax on those premiums ...."), 8(b) ("The premium tax is levied on all amounts defined to be premium ..., whether paid to the title insurance company or retained by the title insurance agent.... The State of Texas facilitates the collection of the premium tax on the premium retained by the agent by setting the division of the premium between insurer and agent so that the insurer receives the premium tax due on the agent's portion of the premium and remits it to the State.").

24. Act approved May 11, 1893, 23d Leg., R.S., ch. 102, § 1, 1893 Tex. Gen. Laws 156. The premium tax statutes have been frequently amended, and codified over the years as Tex.Rev.Civ. Stat. art. 5243e (1895) (taxing "gross premium receipts" of "every life, fire, marine, accident, or other insurance company"), Tex.Rev.Civ. Stat. art. 7376 (1911), and Tex.Rev.Civ. Stat. art. 7064 (1925). Article 7064 was amended by Act of May 29, 1981, 67th Leg., R.S., ch. 844, § 1, 1981 Tex. Gen. Laws 3212, 3212–3215 and later recodified as articles 4.10 (applicable to title insurance companies) and 4.11 of the Insurance Code. Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 36, 1981 Tex. Gen. Laws 1490, 1780–1784. Article 4.10 was, in turn, amended by Act of May 30,1983, 68th Leg., R.S., ch. 283, 1983 Tex. Gen. Laws 1367 and Act of May 24, 1985, 69th Leg., R.S., ch. 161, §§ 3–4, 1985 Tex. Gen. Laws 715, 716. Eventually, in 1987, separate provisions for title insurance were enacted and codified at art. 9.59. Act of June 1, 1987, 70th Leg., R.S., ch. 1073, §§ 22, 23, 1987 Tex. Gen. Laws 3610, 3638–3641. Currently, provisions for gross premium taxes on various kinds of insurance are found in Chapters 221 through 226 of the Insurance Code. Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 1, 2003 Tex. Gen. Laws 3611.

25. 34 Tex. Admin. Code § 3.831(4)(c) ("Title insurers and title agents are both subject to the premium and maintenance tax on their proportional share of the premiums and are separately liable for the tax if the insurer fails to remit the tax due on the agent's portion.").

1987. The Comptroller's position not only discards a settled, decades-old application of statutory provisions frequently revisited and left substantively unchanged by the Legislature, it contradicts the purpose of a tax in place since at least 1935. This tax was based on the burden imposed by other states on the insurance industry and not on an artificial allocation of the tax burden between insurers and their agents.

The Court concludes that the Comptroller's reinterpretation of the statute is due deference under *Tarrant Appraisal District v. Moore.*[26] While an agency's initial interpretation of a statute "is not carved in stone",[27] an agency's decision to depart from a longstanding interpretation is entitled to "considerably less deference" unless the agency provides some reasonable explanation for the change.[28] This is particularly so where the agency's earlier interpretation is accompanied by legislative acquiescence.[29]

But even if the Comptroller's interpretation of "directly imposed" were entitled to more serious consideration, the plain language of the rest of the statute makes clear that the new interpretation is unreasonable.[30] The statute clearly requires the Comptroller to make apples-to-apples comparisons. Section 281.004 instructs the Comptroller to impose and collect the retaliatory tax "in the same manner and for the same purpose" as the foreign insurer's state tax. The Court insists that the retaliatory tax focuses on the insurance company to the exclusion of agents, but it is myopic to view a tax on gross revenue as affecting only some of the participants in the business who must share that revenue. One cannot assume that insurers and agents in other states do not share premium revenues merely because Texas has a statute specifying how they must do so. Indeed, one must assume that insurers and agents expect to be paid and to share in premium revenue. If only the insurer's

**26.** 845 S.W.2d 820, 823 (Tex.1993) ("[C]onstruction of a statute by an administrative agency charged with its enforcement is entitled to serious consideration, so long as the construction is reasonable and does not contradict the plain language of the statute.").

**27.** *Rust v. Sullivan,* 500 U.S. 173, 186, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (quoting *Chevron USA, Inc. v. NRDC,* 467 U.S. 837, 863, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *see also FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 157, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (an agency has ample latitude to adapt its rulings or policies to changing circumstances).

**28.** *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981); *see Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 698, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) (though an agency decision to reinterpret a statute is entitled to *Chevron* deference, such an interpretation is "less persuasive"); *Rust,* 500 U.S. at 187, 111 S.Ct. 1759 (the agency provided "reasoned analysis" to support its changed interpretation); *Flores v. Employees*

*Ret. Sys.,* 74 S.W.3d 532, 544–545 (Tex.App.–Austin 2002, pet. denied) (an agency must explain a decision to depart from a longstanding policy); *City of El Paso v. El Paso Elec. Co.,* 851 S.W.2d 896, 900 (Tex.App.–Austin 1993, writ denied).

**29.** *See Stanford v. Butler,* 142 Tex. 692, 181 S.W.2d 269, 273 (1944) (contemporaneous construction of an act by those charged with its enforcement is " 'worthy of serious consideration as an aid to interpretation, particularly where the construction has been sanctioned by long acquiescence. Although a contemporaneous or practical construction is not absolutely controlling, it has much persuasive force and is entitled to great weight in determining the meaning of an ambiguous or doubtful provision.' ") (citations omitted).

**30.** *Continental Cas. Co. v. Downs,* 81 S.W.3d 803, 807 (Tex.2002) ("Construction of a statute by the agency charged with its enforcement is entitled to serious consideration only if that construction is reasonable and does not contradict the statute's plain language.") (citations omitted).

share of the Texas premium tax is to be considered, then that share must be compared to the insurer's share of the premium tax in the other state. But by comparing only the insurer's share of the Texas premium tax to another state's undivided premium tax, the Comptroller imposes and collects the retaliatory tax in a different manner and for a different purpose than the other state in imposing and collecting its tax.

There is another equally important reason to reject the Comptroller's new interpretation: it makes no sense. In *Western & Southern,* the Supreme Court acknowledged that a state has a legitimate interest in promoting interstate commerce by "deterring other States from enacting discriminatory or excessive taxes." [31] But there is no rational basis for comparing 100% of another state's premium taxes with 15% of Texas' premium taxes to determine whether the other state's taxes are excessive. Texas' legitimate interests in deterring excessive taxation by other states are not served by retaliating whenever another state's industry-wide tax would exceed Texas' tax on some of the participants, or whenever another state employs a different accounting method for calculating and assessing premium taxes. Nor is it served by retaliating against states whose total premium taxes are lower than Texas'. Under the Comptroller's new construction, the retaliatory tax provisions have been transformed into a means for blatant and unapologetic discrimination against out-of-state insurers and parochial protectionism.

The Court asserts that "the Comptroller's interpretation is consistent with the statutory scheme developed by the Legislature", [32] but the fact is that the Comptroller and others who administered the retaliatory tax for decades thought a contrary interpretation was required by the statute. The Court adds that "[t]he Comptroller did not develop this scheme independently as a revenue-raising plan", [33] but no other basis for the "scheme" has been advanced, and none is apparent. The Comptroller's sudden multiplication of the retaliatory tax cannot serve the legitimate state purpose of discouraging excessive taxation in other states because even when a state's tax rate is a fraction of the rate in Texas, insurers from that state must, in the Comptroller's view, pay a retaliatory tax.

I agree with the Court that whether other states may react in a way that is ultimately unfavorable to Texas insurers, or whether the Comptroller's position may have other "unforeseen or unintended results", is none of our business. But it is certainly our business to ensure that persons similarly situated are afforded the equal protection of the law guaranteed by the Fourteenth Amendment. The Court concludes that the retaliatory tax remains "an equalizer between similarly situated title insurers." [34] The Comptroller's treatment of Texas title insurers doing business in other states and out-of-state title insurers doing business in Texas is as equal as 15 is to 100.

I would hold that the Comptroller's position is not permitted by the text of the retaliatory tax statute or by the Fourteenth Amendment. Accordingly, I respectfully dissent.

**31.** 451 U.S. at 668, 101 S.Ct. 2070.

**32.** *Ante* at 639.

**33.** *Ante* at 639.

**34.** *Ante* at 637.