TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00023-CV






In the Matter of J. J.






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. J-21,167, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING





O P I N I O N


 In March 2005, the district court, sitting as a juvenile court, adjudicated J.J.
delinquent, assessed a determinate sentence of twenty years, and placed him in the custody of the
Texas Youth Commission (TYC). In November 2007, the juvenile court ordered that J.J., now
nineteen years old, serve the remainder of his sentence in the custody of the Institutional Division
of the Texas Department of Criminal Justice (TDCJ). In two issues on appeal, J.J. contends that
2007 amendments to the human resources code barred his transfer to TDCJ after he turned nineteen
and that, even if the juvenile court had authority to transfer him, it abused its discretion in doing so.
We will affirm the juvenile court's order.


BACKGROUND

 J.J. was born on April 8, 1988. In November 2004, the State filed its third amended
petition alleging delinquent conduct. In the petition, the State alleged that, on October 10 and 11,
2004, J.J. committed the offenses of aggravated assault with a deadly weapon and aggravated
robbery with a deadly weapon, specifically a firearm. J.J. pleaded true to committing the offenses
alleged in the petition. The juvenile court found that J.J. had engaged in delinquent conduct,
imposed a determinate sentence of twenty years, (1) and ordered that J.J. be committed to the care,
custody, and control of TYC.

 In September 2007, the Acting Executive Director of TYC recommended to the
juvenile court that J.J. be transferred to TDCJ pursuant to section 61.079(a) of the human resources
code. (2) The juvenile court set a transfer hearing for November 8, 2007.

 Prior to the hearing, J.J. filed a "plea to the jurisdiction." In the plea, J.J., who had
turned nineteen in April 2007, argued that section 61.079(a) of the human resources code, as it had
been amended effective June 8, 2007, "only authorizes TYC to refer youth to the juvenile court for
transfer hearings to TDCJ after the youth becomes 16 years of age but before the youth's 19th
birthday." See Tex. Hum. Res. Code Ann. § 61.079(a) (West Supp. 2008). As J.J. observed, "TYC
failed to refer him to the Court for approval of a transfer to TDCJ prior to his 19th birthday." J.J.
further reasoned that "the juvenile court which committed a youth to TYC no longer has any role in
determining whether the youth should be released from TYC and incarcerated in TDCJ after his or
her 19th birthday."

 In response, the State argued that the juvenile court's jurisdiction over J.J.
was governed not by section 61.079 of the human resources code, but by section 51.0411 of the
family code. Section 51.0411 of the family code provides that the juvenile court "retains jurisdiction
over a person, without regard to the age of the person, who is referred to the court under
Section 54.11 for transfer to the Texas Department of Criminal Justice or release under supervision."
Tex. Fam. Code Ann. § 51.0411 (West 2002). The State also argued that the amended version of
section 61.079 of the human resources code did not govern J.J.'s transfer. The version of the statute
that should apply, according to the State, was the version in effect at the time J.J. was adjudicated
delinquent in 2005. That version of the statute gave TYC authority to refer a child to the juvenile
court for transfer to TDCJ before the child becomes 21 years of age. (3)

 The juvenile court denied the plea to the jurisdiction. Then, after hearing evidence,
the juvenile court transferred J.J. to TDCJ to serve the remainder of his twenty-year sentence. This
appeal followed.


ANALYSIS

Statutory authority to transfer J.J. to TDCJ

 We first address J.J.'s second issue, in which he contends that the juvenile
court abused its discretion in transferring J.J. to TDCJ because it lacked statutory authority or
jurisdiction to transfer him after he turned nineteen. (4) In support of this contention, J.J. relies on
sections 61.079(a) and 61.084(g) of the human resources code, as amended in 2007 by Senate Bill
103. (5) As amended, section 61.079(a) provides, in relevant part:


After a child sentenced to commitment under Section 54.04(d)(3), 54.04(m), or
54.05(f), Family Code, becomes 16 years of age but before the child becomes 19
years of age, the commission may refer the child to the juvenile court that entered the
order of commitment for approval of the child's transfer to the Texas Department of
Criminal Justice for confinement . . . .



Tex. Hum. Res. Code Ann. § 61.079(a) (emphasis added). The amended version of
section 61.084(g) provides:


The commission shall transfer a person who has been sentenced under a determinate
sentence to commitment under Section 54.04(d)(3), 54.04(m), or 54.05(f), Family
Code, or who has been returned to the commission under Section 54.11(i)(1), Family
Code, to the custody of the Texas Department of Criminal Justice on the person's
19th birthday, if the person has not already been discharged or transferred, to serve
the remainder of the person's sentence on parole as provided by Section 508.156,
Government Code.



Id. § 61.084(g) (West Supp. 2008) (emphasis added).

 Under the amended versions of these statutes, according to J.J., TYC lost the
authority to refer him to the juvenile court for transfer to TDCJ after he turned nineteen, which in
turn divested the juvenile court of authority to act on such a referral. J.J. further asserts that once
he turned nineteen, the amended version of section 61.084(g) required TYC to transfer him to the
custody of TDCJ to serve the remainder of his sentence on parole.

 The State maintains that the amended versions of these statutes do not apply to J.J.'s
transfer. Instead, the State contends, the versions of the statutes in effect when J.J. was adjudicated
delinquent in 2005 govern. Under these versions of the statutes, TYC could refer a person for
transfer to TDCJ no later than the person's 21st birthday. (6)

 Although we review the juvenile court's decision to transfer a juvenile from TYC
to TDCJ for abuse of discretion, In re F.D., 245 S.W.3d 110, 113 (Tex. App.--Dallas 2008, no pet.),
our resolution of J.J.'s specific contentions here turn on questions of statutory construction, which
present questions of law that we review de novo. First Am. Title Ins. Co. v. Combs, 258 S.W.3d 627,
631 (Tex. 2008). Our primary objective in statutory construction is to give effect to the legislature's
intent. State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). We seek that intent "first and foremost"
in the statutory text. Lexington Ins. Co. v. Strayhorn, 209 S.W.3d 83, 85 (Tex. 2006). We rely on
the plain meaning of the text, unless a different meaning is supplied by legislative definition or is
apparent from context, or unless such a construction leads to absurd results that the legislature could
not have intended. City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26 (Tex. 2008); see Tex. Gov't
Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed
according to the rules of grammar and common usage"). We must consider the statute as a whole
and in context, and not merely consider provisions in isolation. Texas Dept. of Transp. v. City of
Sunset Valley, 146 S.W.3d 637, 642 (Tex. 2004).

 We first observe that the legislature has given the juvenile court "exclusive original
jurisdiction over proceedings under this title [the juvenile justice code]." Tex. Fam. Code Ann.
§ 51.04(a) (West 2002). This jurisdiction extends to proceedings "in all cases involving the
delinquent conduct or conduct indicating a need for supervision engaged in by a person who
was a child within the meaning of this title at the time the person engaged in the conduct." Id. These
proceedings include hearings to release a juvenile under the supervision of TYC or to transfer a
juvenile to TDCJ. See id. § 54.11(a) (West Supp. 2008). (7) Furthermore, the legislature has provided
that "[t]he court retains jurisdiction over a person, without regard to the age of the person, who is
referred to the court under Section 54.11 for transfer to the Texas Department of Criminal Justice
or release under supervision." Id. § 51.0411 (West 2002) (emphasis added).

 The legislature did not amend or alter any of these provisions when it amended
the human resources code. By the express terms of these provisions, the juvenile court retained
jurisdiction to transfer J.J. to TDCJ after he turned nineteen. J.J.'s arguments regarding the 2007
amendments to the human resources code instead potentially implicate whether TYC retained
authority, after J.J. turned nineteen, to refer him to the juvenile court for transfer to TDCJ. The
answer depends on whether the amended versions of sections 61.079(a) and 61.084(g), which took
effect after J.J. was adjudicated delinquent but prior to TYC's referral of J.J. to the juvenile court
for a transfer hearing, govern his referral. In a memorandum opinion decided earlier this year,
this Court concluded that the amended statutes do not apply retrospectively to persons who had
been adjudicated delinquent as juveniles under the prior law. See In re T.G., No. 03-07-00543-CV,
2008 Tex. App. LEXIS 4551, at *21 (Tex. App.--Austin June 19, 2008, pet. denied) (mem. op.)
("We conclude that the legislature intended for the amendments to human resources code
sections 61.079 and 61.084 to operate only prospectively."). J.J. acknowledges this opinion, but
asks that we "review" or reconsider it. We conclude that T.G. was correctly decided, and will
follow it here.

 "A statute is presumed to be prospective in its operation unless expressly made
retrospective." Tex. Gov't Code Ann. § 311.022 (West 2005); see also Tex. Const. art. I, § 16 ("No
bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts,
shall be made."). "Statutes are only applied retroactively if the statutory language indicates that the
Legislature intended that the statute be retroactive." In re M.C.C., 187 S.W.3d 383, 384 (Tex. 2006).
Senate Bill 103 contained language indicating that the legislature may have intended retrospective
application in certain cases involving juveniles who had committed misdemeanors:


A person committed to the Texas Youth Commission on the basis of conduct
constituting the commission of an offense of the grade of misdemeanor under
Subdivision (2), Subsection (d), Section 54.04, Family Code, as it existed before the
effective date of this Act, must be discharged from the custody of the Texas Youth
Commission not later than the person's 19th birthday.



Act of May 25, 2007, 80th Leg., R.S., ch. 263, § 65, 2007 Tex. Gen. Laws 421, 455 (emphasis
added). However, there is no language in Senate Bill 103 indicating that the legislature intended
the amended versions of sections 61.079(a) and 61.084(g) to apply retroactively in cases involving
felony offenses. As this Court observed in T.G., the above provision demonstrates "[t]hat the
legislature knew how to make a provision retrospective," In re T.G., 2008 Tex. App. LEXIS 4551,
at *20, implying that it did not intend similar retrospective application to juveniles who had
committed felonies:


It is equally clear that the legislature sought only to effect an immediate discharge
from the TYC for those persons who had committed a misdemeanor. It necessarily
follows that the legislature did not intend to discharge or release to parole a person
. . . who had committed a felony and had received a determinate sentence.


Id.

 J.J. received a determinate sentence for committing aggravated assault with a deadly
weapon and aggravated robbery with a deadly weapon, both felony offenses. J.J. was sentenced
prior to the effective date of the 2007 amendments to sections 61.079(a) and 61.084(g) of the
human resources code. Absent express language indicating that the legislature intended retrospective
application, we must presume that the amended versions of sections 61.079(a) and 61.084(g) do not
apply here. See In re M.C.C., 187 S.W.3d at 384.

 J.J. attributes significance to the fact that there is no specific savings clause in
Senate Bill 103 involving the statutory amendments at issue in this case. Observing that the
legislature included a specific savings clause for certain other portions of the 2007 amendments, (8)
J.J. suggests that by omitting a similar savings clause for sections 61.079(a) and 61.084(g), the
legislature evidenced its intent to discontinue the former versions of those statutes as soon as
the amended versions became effective. We disagree. Instead, the general savings clause of the
Code Construction Act governs:


(a) Except as provided by Subsection (b),[ (9)
] the reenactment, revision, amendment,
or repeal of a statute does not affect:


 (1) the prior operation of the statute or any prior action taken under it;


 (2) any validation, cure, right, privilege, obligation, or liability previously
acquired, accrued, accorded, or incurred under it;


 (3) any violation of the statute or any penalty, forfeiture, or punishment
incurred under the statute before its amendment or repeal; or


 (4) any investigation, proceeding, or remedy concerning any privilege,
obligation, liability, penalty, forfeiture, or punishment; and the investigation,
proceeding, or remedy may be instituted, continued, or enforced, and the
penalty, forfeiture, or punishment imposed, as if the statute had not been
repealed or amended.



Tex. Gov't Code Ann. § 311.031(a) (West 2005) (emphasis added). We are "to presume that
the general savings clause applies unless a contrary legislative intent is shown by clear expression
or necessary implication." Quick v. City of Austin, 7 S.W.3d 109, 130 (Tex. 1999). Finding no
contrary legislative intent, we conclude that the general savings clause applies in this case. 
Specifically, subsection (a)(4) applies, as the hearing to transfer J.J. to TDCJ was a proceeding
concerning his punishment for the felony offenses he had previously committed and for which he
had been adjudicated delinquent prior to the effective date of Senate Bill 103.

 We conclude that the versions of sections 61.079(a) and 61.084(g) of the
human resources code in effect at the time J.J. was adjudicated delinquent in 2005 govern TYC's
referral of him to the juvenile court for possible transfer. Consequently, TYC retained the authority
to refer J.J. to the juvenile court for transfer to TDCJ after he turned nineteen. We overrule J.J.'s
second issue.


Merits of the transfer order

 We now address J.J.'s first issue, in which he challenges the merits of the juvenile
court's decision to transfer him to TDCJ. According to J.J., he should not have been transferred to
TDCJ because he was "advancing in all phases of the [TYC] resocialization program."

 Once TYC refers a person to the juvenile court for a transfer, the juvenile court is
required to hold a hearing to determine whether to transfer the person to the custody of TDCJ for the
completion of the person's sentence. See Tex. Fam. Code Ann. § 54.11(a), (i) (West Supp. 2008). 
In making this determination, the juvenile court may consider a number of factors, including:


(i) the experiences and character of the person before and after commitment to
the youth commission; 


(ii) the nature of the penal offense that the person was found to have committed
and the manner in which the offense was committed;


(iii) the abilities of the person to contribute to society; 


(iv) the protection of the victim of the offense or any member of the victim's
family; 


(v) the recommendations of the youth commission and prosecuting attorney; 


(vi) the best interests of the person; and 


(vii) any other factor relevant to the issue to be decided.



Id. § 54.11(k). The juvenile court is not required to consider all of the factors, and the court
is expressly allowed to consider unlisted but relevant factors. In re C.L., 874 S.W.2d 880, 886
(Tex. App.--Austin 1994, no writ). Evidence of each listed factor is not required. Id. Similarly,
the juvenile court may assign different weights to the factors it considers. Id.

 We review the juvenile court's decision to transfer a juvenile from TYC to TDCJ
for abuse of discretion. In re F.D., 245 S.W.3d at 113; In re C.L., 874 S.W.2d at 886. In deciding
whether the juvenile court abused its discretion, we review the entire record to determine if
the court acted without reference to any guiding rules or principles. In re J.L.C., 160 S.W.3d 312,
313 (Tex. App.--Dallas 2005, no pet.). If "some evidence" exists to support the juvenile court's
decision, there is no abuse of discretion. In re F.D., 245 S.W.3d at 113; In re D.L., 198 S.W.3d
228, 229 (Tex. App.--San Antonio 2006, pet. denied); In re R.G., 994 S.W.2d 309, 312
(Tex. App.--Houston [1st Dist.] 1999, pet. denied).

 At the transfer hearing, the juvenile court considered testimony from several
witnesses. Emir Perez, J.J.'s probation officer, testified briefly about J.J.'s criminal history. Perez
testified that, in addition to the offenses for which J.J. had been adjudicated delinquent, J.J. had also
been accused of committing the offenses of criminal trespass in 2001 and failing to attend school in
2003 and 2004. Perez further testified that "there was a referral in December of 2004 for aggravated
assault with a deadly weapon." According to Perez, J.J. was alleged to have used a kitchen knife in
the December 2004 assault, and, on the offenses for which J.J. had received his determinate
sentence, J.J. was alleged to have used a .32 caliber revolver and a knife.

 Leonard Cucolo, TYC's court liaison, summarized for the juvenile court J.J.'s
behavior and progress while J.J. was in the custody of TYC. Cucolo testified as follows:


Well, Jimmy has been with us for 31 months. During that time, he's engaged in 85
documented incidents of misconduct. Eight of those are self-referrals and are not
considered incidents of misconduct and are actually good things.


He was placed in the security unit on 19 occasions. His last placement occurred in
September of this year for danger to others. Overall, his behavior has been
inconsistent to poor. That's how I described it.


More importantly, his behavior has reflected some very serious assaults. Actually
two new felony offenses that were committed while confined in the Texas Youth
Commission. One in November of '05, and one recently over where the youth was
assaulted in July of this year.


Both victims sustained injuries and required hospitalization. So there's serious
assaultive behavior problems that he's engaged in.



Cucolo explained that J.J. had engaged in four incidents that were characterized as Category 1
violations, which were considered to be the most serious. Two of those incidents were the assaults
mentioned above. In the November 2005 assault, J.J. punched a corrections officer in the face,
injuring his eye. In the July 2007 assault, J.J. hit a youth "several times in the facial area." Cucolo
testified that J.J. knocked the youth to the ground and rendered him unconscious. The other two
Category 1 violations were an "assault by threat and a bodily injury" in September 2005, and
"tampering with technology and safety equipment" in August 2006.

 Cucolo added that J.J. "has done well on occasion" and that he has been able to
maintain good behavior for "a period of time." However, according to Cucolo, J.J. has "never been
able to sustain it." Cucolo further testified that J.J. did "very well" academically and completed
TYC's "Building Trades Program," "Independent Living Project," and "Project Rio," a program
designed to prepare juveniles for interviewing and getting a job. Nevertheless, Cucolo explained,
TYC was recommending that J.J. be transferred to TDCJ because of the "very serious assaultive
behavior" that J.J. had engaged in as recently as July of that year.

 Dr. Nancy Razo, TYC's Director of Clinical Services at the facility where J.J. had
been in custody, evaluated J.J. for transfer to TDCJ. Dr. Razo testified that, during her interview
with J.J., he minimized his responsibility for the offenses for which he had been adjudicated
delinquent and "took no responsibility for his behavior." Razo also disputed whether J.J. had
made progress in TYC's resocialization program. In fact, Razo testified that she believed there
were times during J.J.'s stay in the facility when, as a result of his behavior, J.J. should have been
demoted to lower "correctional phases," but he was not. (10)

 Dr. Razo agreed with TYC's recommendation that J.J. be transferred to TDCJ. Razo
admitted that one of the reasons she recommended the transfer was because the effects of Senate Bill
103 were still uncertain, and TYC was "under the impression" that offenders who had turned
nineteen needed to be released or transferred. However, Razo added that she probably would have
recommended J.J.'s transfer even if Senate Bill 103 had not been an issue. Razo testified that
her recommendation was based on her concerns that the assault J.J. had committed in July was
violent, that it occurred when J.J. was already aware that he was facing transfer, and that J.J. did not
take responsibility for committing the offenses that had resulted in his adjudication. Razo was also
concerned that J.J. was, in her words, "covert," meaning that he could commit a violent offense "all
of a sudden" and with "no warning." When asked if there were any additional services that could
be offered to J.J. if he was returned to the custody of TYC, Razo testified, "There's really nothing
different that could be offered. . . . [W]e really exhausted all possibilities. . . ."

 Cary Grant, J.J.'s case manager, testified that when he talked to J.J. about the
July 2007 assault, J.J. told him that he was acting in self-defense and that the other youth hit him
first. However, Grant added, J.J.'s explanation of the assault contradicted the written report of the
incident. Also, Grant testified, J.J. had difficulty accepting responsibility for the full extent of the
injuries sustained by the youth that he had assaulted. Grant recounted, "[H]e felt that most of the
injury had been caused when the kid's head hit the cement. Because I had to explain to him you
knocked him unconscious, anything that happened to the kid after that was also your responsibility. 
That part he didn't grasp." On cross-examination, Grant testified that J.J. was no longer "defiant,"
that he had been making an "effort" to "work the program," and that he was no longer a disruption
to the program.

 To summarize, while there was evidence that J.J. was making some progress in
TYC's resocialization program, this evidence was disputed by Dr. Razo. On the other hand, it was
undisputed that J.J. engaged in violent, assaultive behavior on multiple occasions both before and
after he was committed to TYC, including a serious incident in July 2007--less than five months
before J.J.'s transfer hearing--that rendered a youth unconscious. Furthermore, there was evidence
that the offenses for which J.J. had been adjudicated delinquent were violent crimes involving deadly
weapons and that J.J. refused to accept full responsibility for the offenses he had committed. On this
record, we find that "some evidence" exists to support the juvenile court's decision to transfer J.J.
to TDCJ. Accordingly, we conclude that the juvenile court did not abuse its discretion. We overrule
J.J.'s first issue.


CONCLUSION

 We affirm the order of the juvenile court.


 

 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton

Affirmed

Filed: December 31, 2008
1. A determinate sentence is one in which the term of commitment begins in the custody of
TYC with a possible transfer to TDCJ. See Tex. Fam. Code Ann. § 54.04(d)(3) (providing for
determinate sentencing) (West Supp. 2008); see also Tex. Fam. Code Ann. § 53.045(a) (listing
certain offenses for which determinate sentence may be assessed). A determinate sentence is usually
reserved for violent or habitual juvenile offenders. See Robert Dawson, Texas Juvenile Law 421-25
(6th ed. 2004) (explaining history and scope of determinate-sentencing system).
2. We note that this was not the first time that TYC recommended J.J.'s transfer to TDCJ. 
The record reflects that, on May 11, 2006, when J.J. was eighteen, TYC referred J.J. to the juvenile
court for a transfer hearing, but, on June 14, 2006, TYC withdrew its request.
3. See Act of May 27, 1995, 74th Leg., R.S., ch. 262, § 61, 1995 Tex. Gen. Laws 2517, 2572
(amended 2007) (current version at Tex. Hum. Res. Code Ann. § 61.079(a) (West Supp. 2008)).
4. The State attempts to distinguish between J.J.'s arguments below challenging the juvenile
court's "jurisdiction" and his arguments on appeal, which are phrased in terms of the juvenile
court's "authority" and whether it "abused its discretion" in exceeding that authority. Relying on
this purported distinction, the State argues that J.J. has failed to brief his contentions regarding
the juvenile court's "jurisdiction" on appeal. We disagree. Whether styled in terms of a lack of
"jurisdiction," lack of "authority," or abuse of discretion, J.J.'s central contention both here
and below has been that the 2007 amendments to the human resources code precluded his transfer
to TDCJ because he was age 19 at the time of the transfer order. J.J. has preserved this contention
on appeal.
5. See Act of May 25, 2007, 80th Leg., R.S., ch. 263, 2007 Tex. Gen. Laws 421 (effective
June 8, 2007).
6. See Act of May 27, 1995, 74th Leg., R.S., ch. 262, § 61, 1995 Tex. Gen. Laws 2517, 2572,
2573-74 (current versions at Tex. Hum. Res. Code Ann. §§ 61.079(a), 61.084(g) (West Supp.
2008)).
7. Section 54.11(a) provides,


On receipt of a referral under Section 61.079(a), Human Resources Code, for
the transfer to the institutional division of the Texas Department of Criminal Justice
of a person committed to the Texas Youth Commission under Section 54.04(d)(3),
54.04(m), or 54.05(f), or on receipt of a request by the commission under
Section 61.081(g), Human Resources Code, for approval of the release under
supervision of a person committed to the commission under Section 54.04(d)(3),
54.04(m), or 54.05(f), the court shall set a time and place for a hearing on the release
of the person.


Tex. Fam. Code Ann. § 54.11(a) (West Supp. 2008).
8. For example, section 67 provides:


The change in law made by Section 54.052, Family Code, as added by this Act, and
Subsection (c), Section 61.0841, Human Resources Code, as added by this Act,
applies only to conduct for which a child is adjudicated on or after the effective date
of this Act. A child who is adjudicated before the effective date of this Act is
governed by the law in effect when the child was adjudicated, and the former law is
continued in effect for that purpose.


Act of May 25, 2007, 80th Leg., R.S., ch. 263, § 67, 2007 Tex. Gen. Laws 421, 455 (emphasis
added).
9. Subsection (b) provides, "If the penalty, forfeiture, or punishment for any offense is
reduced by a reenactment, revision, or amendment of a statute, the penalty, forfeiture, or punishment,
if not already imposed, shall be imposed according to the statute as amended." Tex. Gov't Code
Ann. § 311.031(a) (West 2005). As there was no reduction in "penalty, forfeiture, or punishment"
in this case, this subsection does not apply.

10. "Correctional phases" measure a juvenile's progress in TYC's correctional programs.
When juveniles begin at TYC, they start at phase C-0. C-4 is the highest phase a juvenile can obtain.
Dr. Razo testified that, when she evaluated J.J., he was listed at a C-4 even though, according to
Razo, his behavior and failure to accept personal responsibility for his actions merited a C-3 or C-2.
Razo testified that C-2 is the lowest phase to which a juvenile can be demoted.


 There are also "academic phases" and "behavioral phases" that operate in a similar
manner. The record reflects that, at the time of the transfer hearing, J.J. had attained an A-4, the
highest academic level. As for his behavioral level, in the year before he was transferred, J.J. had
fluctuated between a B-3 and a B-4. At the time of the transfer hearing, he was at a B-3.