# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================================

## ON MOTION FOR REHEARING

========================================

## NO. 03-07-00709-CV

**Reynolds Metals Company, Appellant**

**v.**

**Susan Combs, Successor to Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. D-1-GN-04-001468, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Upon consideration of appellant's motion for rehearing, we overrule the motion; however, we withdraw our opinion and judgment dated February 4, 2009, and substitute the following in its place.

This is an appeal from a summary judgment in a suit to recover a sales tax refund. The sole issue presented is whether Reynolds Metals Company's purchase of parts for two ship unloaders that operate on rails qualified for the rolling stock exemption to the Texas sales and use tax. Concluding that the district court did not err in granting summary judgment that Reynolds's purchases do not qualify under the exemption, we will affirm the district court's judgment.

Reynolds produces and manufactures aluminum oxide, or alumina, at a plant in Gregory, Texas. It extracts the alumina from bauxite ore, which it receives by ship. Reynolds uses the ship unloaders at issue in this appeal to unload the bauxite ore from the ships and dump the ore onto a series of conveyors for further processing.

After exhausting administrative remedies, Reynolds filed suit under chapter 112 of the tax code seeking a refund of sales and use tax the Comptroller required it to pay on parts and services related to its production system for the period between March 1, 1994, through December 31, 2000. Among Reynolds's contentions was that its purchases of repair and replacement parts for its ship unloaders were exempt from sales and use tax under section 151.331 of the tax code. Section 151.331 provides, in relevant part:

> (a)    Rolling stock, locomotives, and fuel and supplies essential to the operation of locomotives and trains are exempted from the taxes imposed by this chapter.

Tex. Tax Code Ann. § 151.331(a) (West 2008). Reynolds alleged that its "ship unloaders qualify as rolling stock because they operate on and are supported by rails."

Reynolds and the Comptroller[1] filed cross-traditional motions for partial summary judgment that joined issue on whether Reynolds's purchase of repair and replacement parts for its ship unloaders fell within the rolling-stock exemption of section 151.331.[2] Reynolds presented

---

[1] Because the interests of the Comptroller and the Attorney General in the litigation align, we refer to them collectively as the "Comptroller." *See* Tex. Tax Code Ann. § 112.053 (West 2008) (requiring the Comptroller and the Attorney General to be named as defendants in tax protest suit).

[2] The Comptroller also asserted the ground that Reynolds was not a licensed and certificated common carrier, which it asserted was required under its rule implementing the rolling stock

undisputed affidavit testimony that the unloaders "have wheels similar to those found on trains and like trains travel by rolling on two railroad rails that were constructed to support them," "are designed to operate solely on those two rails and rely on those rails for support," and "are self propelled and are powered by electro-hydraulic traction motors."[3] However, Reynolds's summary-judgment evidence also included schematic drawings of the unloaders showing them to be large, crane-like structures of approximately 83 feet in height and 82 feet in front-to-back length along their wheel base. Other features of the unloaders were revealed in Reynolds's responses to the Comptroller's requests for admissions, which the Comptroller presented in support of its traditional motion:

- the gauge or width of the rails on which the ship unloaders operated was forty-seven feet

- the unloaders were used to transport bauxite from a ship's hold to a conveyor belt by using a bucket dredge to dig the bauxite out of the hold and place it on the conveyor

exemption. *See* 34 Tex. Admin. Code § 3.297(a)(1) (1999). The Comptroller similarly filed a no-evidence cross-motion for partial summary judgment on the ground that there was no evidence Reynolds's purchases for the ship unloaders were "essential to the operation of locomotives and trains" or that "the parts are required by federal or state regulation." *Id.* § 3.297(f). The district court explicitly denied summary judgment on these grounds, and they are not before us on appeal.

[3] Reynolds also presented affidavit testimony regarding the nature of the repair and replacement parts at issue: "The Parts include a replacement unloader motor, unloader motor repair parts, unloader buckets, unloader bucket repair parts, an unloader boom cylinder, unloader chains, unloader chain repair parts, unloader drive shafts, unloader bearings, unloader cylinders, unloader hydraulic system parts, an unloader hydraulic pump, an unloader rail clamp, and various other repair and replacement parts for the Unloaders." "All of these parts," furthermore, "were purchased to repair or replace portions of the Unloaders . . . were incorporated into the Unloaders and became essential components of the Unloaders."

- the unloaders moved on the rails to position themselves between the ship's hold and the conveyor on which they placed the bauxite

- during the period at issue, each unloader was not "a railway vehicle that provides the motive power for a train [that] has no payload capacity of its own [and whose] sole purpose is to move the train along the tracks"

- during the period at issue, Reynolds was not a railroad common carrier or motor common carrier, did not represent its business to the public as one of transporting persons or freight from place to place for compensation or as being open to the public for transportation use, and that its use of the unloaders was not subject to the Federal Railroad Safety Act of 1970, the Federal Railroad Safety Authorization Act of 1994, the Federal Railroad Administration, the U.S. Department of Transportation, or regulated by the Texas Railroad Commission

On the other hand, Reynolds denied requests for admissions that the unloaders were not "self-propelled railway vehicle[s] designed to transport passengers" or "rail vehicles that move along guides to transport freight or passengers from one place to another." In response to a related interrogatory, Reynolds elaborated that "[t]he unloaders are designed to transport freight and passengers and do in fact carry bauxite and employees of [Reynolds]."

The district court denied Reynolds's summary-judgment motion and granted the Comptroller's cross-motion "on the ground that [Reynolds] is not entitled to the rolling stock exemption in Texas Tax Code § 151.331(a)." Subsequently, Reynolds abandoned its other claims and the district court rendered final judgment for the Comptroller. This appeal ensued.

In a single issue, Reynolds argues that the district court erred in granting the Comptroller's summary-judgment motion and denying Reynolds's motion because its purchase of repair and replacement parts for its two ship unloaders came within the rolling-stock exemption in section 151.331(a). When parties file cross-motions for summary judgment on overlapping

issues and the trial court grants one motion and denies the other, an appellate court should review the summary-judgment evidence supporting each motion and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). The appellate court "should render the judgment that the trial court should have rendered." *Id.*

Our disposition of Reynolds's issue turns on construction of the "rolling stock" exemption to the Texas sales and use tax; specifically, whether Reynolds's ship unloaders constitute "rolling stock" and whether the parts constitute "rolling stock" or "fuel and supplies essential to the operation of locomotives and trains." Tex. Tax Code Ann. § 151.331(a). Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *Id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage"). However, with regard to a statute that an agency is charged with enforcing, we give "serious consideration" to the agency's construction of it, so long as that construction is reasonable and consistent with the statutory language, and this is particularly true when the statute involves complex subject matter within the agency's area of expertise. *See First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008); *cf. Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin

2001, no pet.) (courts "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise or deal with a nontechnical question of law") (internal citation omitted). In this case, we are also guided by the principle that tax exemptions are strictly construed against the taxpayer in favor of the taxing authority. *See First Baptist Church v. Bexar County Appraisal Review Bd.*, 833 S.W.2d 108, 117 (Tex. 1992).

Reynolds places little emphasis on the text of section 151.331(a) itself. It instead argues that we must look to imputed or inferred legislative intent under the doctrine of legislative acceptance. The doctrine of legislative acceptance contemplates that "[a] statute of doubtful meaning that has been construed by the proper administrative officers, when re-enacted without any substantial change in verbiage, will ordinarily receive the same construction." *Humble Oil & Ref. Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex. 1967). The doctrine derives from a presumption that the legislature is familiar with its previously enacted statutes and the manner in which courts and agencies have construed and applied them. *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 196 (Tex. 2004). Based on that presumption, it is further presumed that if the legislature re-enacts an ambiguous statute that has been interpreted by a court of last resort or by the appropriate administrative officer, the legislature intends to adopt the construction of the court or the administrative officer. *See id.*

Reynolds asserts that "for decades, the Comptroller interpreted the rolling stock exemption to include any equipment that was operated on railroad rails" (which it asserts the ship unloaders were) and "also consistently applied the exemption to parts used to repair rolling stock." Reynolds complains that in 2000, toward the end of its refund period, "the Comptroller

6

reversed its longstanding policy with a new policy that limited the exemption to 'conventional or traditional railroad equipment, or, at the least, equipment mounted on rails that connect to traditional railroads.'" *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 200007600H (effective July 5, 2000).[4] The Comptroller's "new policy" conflicts with section 151.331(a), Reynolds contends, because the legislature manifested its intent to adopt the Comptroller's "longstanding policy" when—without substantive change to the language that now appears in section 151.331(a)—it reenacted the rolling stock exemption in 1969,[5] it nonsubstantively recodified

---

[4] "STAR" refers to the "State Tax Automated Research" System, available on the Comptroller's website at http://cpastar2.cpa.state.tx.us/.

[5] As originally enacted in 1961, the rolling stock exemption provided:

> There are exempted from the taxes imposed by this Chapter receipts from any sale, use, storage or other consumption of locomotives and rolling stock, including fuel or supplies for the direct operation of locomotives and trains.

Act of Aug. 8, 1961, 57th Leg., 1st C.S., ch. 24, 1961 Tex. Gen. Laws 71, 86. In 1963, the legislature reenacted the exemption with the same language:

> There are exempted from the taxes imposed by this Chapter receipts from any sale, use, storage, or other consumption of locomotives and rolling stock, including fuel or supplies for the direct operation of locomotives and trains.

Act of May 2, 1963, 58th Leg., R.S., ch. 138, 1963 Tex. Gen. Laws 371, 387. Thereafter, between 1963 and 1982, the legislature amended various exemptions to the sales and use tax without changing the substance of the rolling stock exemption. Reynolds emphasizes that in 1969, the legislature repealed the entire exemption statute and reenacted it with amendments, but reenacted the former language of the rolling stock exemption verbatim. Act of Sept. 6, 1969, 61st Leg., 2nd C.S., ch. 1, 1969 Tex. Gen. Laws 61, 78.

the entire sales and use tax statute in 1982,[6] and reenacted the exemption when adding subsection (b) to section 151.331(a).[7] We disagree.

For the legislative acceptance doctrine to apply based on an administrative interpretation of a statute, the interpretation must be longstanding, uniform, and clear. *See Calvert*, 414 S.W.2d at 180 (applying legislative acceptance doctrine where Comptroller had "consistently allocated" franchise tax receipts under "location of payor test" between 1917 and 1963); *Texas Citrus Exch. v. Sharp*, 955 S.W.2d 164, 171 (Tex. App.—Austin 1997, no pet.) (holding legislative acceptance doctrine inapplicable to "the Comptroller's unwritten policy in implementing one of its own rules, a policy on which the Comptroller has flip-flopped three times in thirteen years").[8]

---

[6] The 1982 recodified version of the rolling stock exemption consisted of the language that now appears in subsection (a) of section 151.331(a):

> Rolling stock, locomotives, and fuel and supplies essential to the operation of locomotives and trains are exempted from the taxes imposed by this chapter.

Act of May 29, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1569; *see also id.* § 40 ("This Act is intended as a recodification only, and no substantive change in the law is intended by this Act.").

[7] In 1995, the legislature renumbered the 1982 version as subsection (a) of section 151.331 and added a new subsection (b): "Electricity, natural gas, and other fuels used or consumed predominantly in the repair, maintenance, or restoration of rolling stock are exempt from the taxes imposed by this chapter." Act of May 28, 1995, 74th Leg., R.S., ch. 1025, § 1, 1995 Tex. Gen. Laws 5105, 5106; *see also* Tex. Const. art. III, § 36 (requiring that section or sections of existing laws amended by the legislature "shall be re-enacted and published at length").

[8] The legislative acceptance doctrine also does not apply unless the statute at issue is ambiguous. *See Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 282 (Tex. 1999) (citing *Humble Oil & Ref. Co. v. Calvert*, 414 S.W.2d 172, 180 (Tex. 1967)). "Under the doctrine of legislative acceptance," in other words, "an administrative agency's construction of a statute cannot contradict the statute's plain meaning." *Id.* As we base our decision on other grounds, we need not determine the issue of ambiguity.

Both parties refer us to the Comptroller's rules implementing the rolling stock exemption and various Comptroller decisions. As originally promulgated following the 1961 enactment of the sales and use tax, the Comptroller's rule included a definition of "rolling stock": "The term 'rolling stock' shall apply only to the railroad industry and there it shall mean that railroad cars used for carrying of persons or property, the engine or locomotive, and the railroad cars used for the carrying of fuel to power the train." *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 6203R0074D09 (effective March 21, 1962). In 1963, the Comptroller changed the rule to provide that "[t]he term "rolling stock" means and includes any equipment which is operated on railroad rails." *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 6309R0074D03 (effective Sept. 6, 1963). This language remained in subsequent versions of Ruling 14 and its successor, Rule .017, until the Comptroller omitted the definition in a revised version of the rule that took effect on March 31, 1982. *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 8203R0382D11 (effective March 31, 1982), codified at 34 Tex. Admin. Code § 3.297 (2008). The new rule provided simply that "Sales or use tax is not due on the sale or use of locomotives and rolling stock." *Id.* Observing that the 1982 rule change occurred after the 1982 recodification of the rolling stock exemption, Reynolds argues that the legislature in the 1982 enactment necessarily intended to incorporate the construction from the Comptroller's former rule. Reynolds also cites five pre-codification Comptroller letter rulings that it contends adopted its asserted construction.

Reynolds further argues that even after its 1982 rule change, the Comptroller continued its "longstanding policy applying the rolling stock exemption to any equipment operated on railroad rails." Reynolds urges that "the preambles to the proposed [1982] regulation and the

9

adopted regulation gave no indication of a change in Comptroller policy regarding rolling stock." Reynolds also cites a post-codification, post-rule change Comptroller letter ruling from 1982 and two from 1990 that, it asserts, reflect a continuation of the "longstanding policy." It reasons that the legislature again adopted this interpretation when reenacting and amending the rolling stock exemption in 1996.

Four of the five pre-codification letter rulings cited by Reynolds do not demonstrate any construction of "rolling stock"—favorable or unfavorable to Reynolds—by the Comptroller. *See* Tex. Comptroller of Pub. Accounts, STAR Document Nos. 6602H0259E12 (issued Feb. 9, 1966); 7407L0020B05 (issued July 1, 1974); 7506L0022D10 (issued June 1, 1975); 7607L0026A08 (issued July 1, 1976). In each of these rulings, the Comptroller determined that certain equipment purchased by a company for intraplant operations was exempt as rolling stock. At issue, however, was not the proper construction of the term "rolling stock" but whether the fact that the taxpayer was not in the business of being a common carrier was material to the exemption's application. The rulings contain no description of the equipment at issue and no discussion of the construction of the term "rolling stock." It is simply presumed that the equipment is "rolling stock." The rulings rest solely upon the determination that "[t]he fact that the taxpayer is not in the business as a common carrier is immaterial, as the exemption relates to all rolling stock." *Id.*

In the other pre-codification decision cited by Reynolds, the taxpayer was in the business of selling railroad car scraps and culverts. *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 7801H0268A12 (issued Jan. 20, 1978). The equipment at issue included cranes that were self-propelled and permanently mounted on railroad rails. The cranes were "used in moving

salvage materials around the salvage yard, disassembling railroad cars, and unloading scrap metal from railroad cars." *Id.* According to the Comptroller in its ruling, "the key element is whether or not the equipment is permanently mounted or permanently operated on railroad rails and not the use the equipment is put to by its operators." *Id.* Reynolds emphasizes the Comptroller's focus on the fact that the cranes were mounted and operated on railroad rails, suggesting a parallel to its crane-like ship unloaders. However, it remains that the cranes at issue in the decision, unlike Reynolds's ship unloaders, were mounted on traditional railroad tracks and used in operations involving traditional railroad equipment. Given this factual context, it is a stretch to read this ruling as standing for the proposition that literally any equipment that could be said to operate on railroad rails—including a ship unloader on rails spaced 47 feet apart—constitutes "rolling stock." And, even if it could support Reynolds's interpretation, a single decision does not constitute the sort of longstanding administrative interpretation that the legislative acceptance doctrine requires. *City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 445 (Tex. 2002); *see also Wilson v. State*, ___ S.W.3d ___, No. 03-07-60444-CV, 2008 Tex. App. LEXIS 8738 (Tex. App.—Austin 2008, no pet. h.).

Moreover, the Comptroller cites to a 1976 letter ruling that suggests a narrower view of the rolling stock exemption. *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 7609T0029A05 (issued Sept. 1, 1976). At issue was the taxability of a self-propelled stacker built on wheels to run on railroad tracks approximately 600 to 700 feet in length. Although the Comptroller held the equipment not to be exempt based on whether they were "rolling stock" when they entered the state, the Comptroller observed that if,

11

the materials had not been fabricated out of state and shipped into Texas, it is still doubtful whether the stacker itself constitutes "rolling stock" within the meaning of Article 20.04(S). "Rolling Stock" is defined in Ruling .017 as "any equipment which is operated on railroad rails." Although the stacker operates on rails which could be used for railroad purposes, it is not rolling stock in the sense used in Article 20.04(S) which, speaks to "locomotives and rolling stock" and "locomotives and trains". The stacker is better described in Article 20.04(E)(b)(ii): machinery, equipment, materials and supplies used in a manner that is merely incidental to the manufacturing, processing or fabricating operation such as intraplant transportation equipment . . . . Such intraplant transportation equipment is not exempt.

*Id.* Reynolds acknowledges that this ruling "questions" what it contends was "the Comptroller's longstanding policy" in interpreting the rolling stock exemption, but dismisses it as dicta. Even so, it is nonetheless indicative of the absence of the sort of clear, consistent, and longstanding administrative policy that the legislative acceptance doctrine contemplates. *See Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 282 (Tex. 1999) (legislative acceptance doctrine inapplicable where, among other things, the Comptroller's administrative interpretations had been inconsistent).

We also question whether the legislative acceptance doctrine properly applies to the 1982 recodification of the tax code.[9] The logical underpinning of the legislative acceptance doctrine, as previously suggested, is that the legislature's intent to "accept" a prior judicial or administrative construction of a statute when reenacting it may be inferred from the fact that the legislature chose not to make substantive changes under circumstances when it might otherwise have been expected to do so if it had disagreed with the judicial or administrative interpretation. *See Calvert*, 414 S.W.2d at 175 (tax code provision was substantively amended). However, the legislature's

---

[9] Nor, for reasons already explained, was there a longstanding, clear and consistent Comptroller policy of construing the rolling stock exemption in the manner Reynolds proposes prior to the 1969 reenactment of the rolling stock exemption, the basis for the 1982 recodification.

12

expressed intent in the 1982 recodification of the tax code was to make *no* substantive changes in the law. Act of May 29, 1981, 67th Leg., R.S., ch. 389, § 40, 1981 Tex. Gen. Laws 1490, 1787 ("This Act is intended as a recodification only, and no substantive change in the law is intended by this Act."). It is dubious to infer legislative intent from the fact that the legislature chose not to make a substantive change to the rolling stock exemption in a recodification whose express purpose was to make no substantive changes to the tax code. *See Public Util. Comm'n of Tex. v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 324 (Tex. 2001) (distinguishing statutory reenactment from recodification, and holding that legislative acceptance is based only on the former).[10]

Nor do the post-codification developments evidence the requisite longstanding, clear and consistent policy regarding interpretation of "rolling stock" such that the legislative-acceptance doctrine could apply to the 1996 amendment and reenactment of section 151.331. To the extent the Comptroller's former definition of "rolling stock" was significant, it was repealed in 1982. Reynolds cites a Comptroller letter ruling later that year determining that the rolling stock exemption applied to scrap bucket transfer cars because the cars were "permanently mounted or permanently operated on railroad rails." *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 8207L0466B04 (issued July 14, 1982). Reynolds points out that there is no indication that the rolling stock was

---

[10] On rehearing, Reynolds suggests that the supreme court has not been entirely consistent in this view, citing a case from the preceding year in which the court relied on the legislative acceptance doctrine as the last of several grounds it cited in support of a particular construction of a nonsubstantive recodification. *See Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000) (citing Tex. Civ. Prac. & Rem. Code Ann. § 38.006), *see also* Act of May 17, 1985, 69th Leg., R.S., ch. 959, 1985 Tex. Gen. Laws 3242, 3242. In *Grapevine Excavation*, unlike *City Public Service Board*, the court did not address whether the legislative acceptance doctrine applied to a nonsubstantive codification, but appeared merely to assume that it did. *Grapevine Excavation*, 35 S.W.3d at 5. To the extent these decisions conflict, we note that *City Public Service Board* is the more recent of the two.

13

connected to a traditional railroad. However, there is also no indication that the rolling stock was not connected to a traditional railroad. The ruling is simply silent. It addresses the rolling stock issue in only three sentences:

> To be rolling stock, the equipment must be permanently mounted or permanently operated on railroad rails. It appears that the scrap bucket transfer cars meet the qualification for rolling stock. The trackmobile may also be rolling stock if it is never removed from the tracks.

*Id.* Based on the ruling, we cannot determine whether the equipment at issue was mounted on traditional railroad rails or used in traditional railroad operations. It is equally probable as not that the equipment was mounted on traditional railroad rails or used in relation to traditional railroad operations.

Reynolds also cites a 1990 ruling involving an amusement car train. *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 9003L0996A01 (issued Mar. 30, 1990). The Comptroller determined that the rolling stock exemption applied. Although Reynolds contends that there was "[n]o indication that the rolling stock was connected to a traditional railroad," the equipment at issue was simply smaller scale traditional railroad equipment, including "locomotives" and "coaches" or "trains." *Id.*; *see also* 34 Tex. Admin. Code § 3.297 (specifically referring to "locomotives" and "trains" in applying the exemption).

Reynolds cites another 1990 letter ruling in which the Comptroller determined that the rolling stock exemption applied to train unloaders. *See* Tex. Comptroller of Pub. Accounts, STAR Document No. 9002L0979E06 (issued Feb. 8, 1990). Unlike the ship unloaders operated by Reynolds, the train unloaders were mounted on traditional railroad tracks and were used in

14

conjunction with traditional railroad equipment. In fact, in its ruling, the Comptroller suggests that this fact might be an essential component of the determination: "You also assured me that the loader will not be removed from the train." *Id.* The Comptroller's emphasis on this fact in its ruling is significant and evidences a relationship between the exemption and traditional railroads and railroad equipment.

In sum, the Comptroller did not have a long-standing, clear and consistent policy of interpreting the "rolling stock" exemption to apply literally to any equipment mounted on what could be termed railroad rails such that we would infer the legislature's intention to adopt that interpretation through its 1982 or 1996 enactments. If anything, the history of the Comptroller's application of the exemption during this period demonstrates a consistent policy of tying the rolling stock exemption to traditional railroad equipment. The legislative acceptance doctrine does not support Reynolds's proposed construction of the exemption.

We further conclude that the Comptroller's interpretation that the rolling stock exemption does not extend to Reynolds's ship unloaders is reasonable and not inconsistent with the statutory language. *See First Am. Title Ins. Co.*, 258 S.W.3d at 632 (we give "serious consideration" to the agency's construction of a statute, as long as that construction is reasonable and consistent with the statutory language). In light of the Comptroller's construction and the requirement that tax exemptions be strictly construed against the taxpayer and in favor of the taxing authority, *see First Baptist Church*, 833 S.W.2d at 117, we agree with the district court that, as a matter of law, the rolling stock exemption does not apply to Reynolds's ship unloaders and that summary judgment on that issue was appropriate.

15

We affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed on Motion for Rehearing

Filed:   April 8, 2009