IN THE SUPREME COURT OF TEXAS
 
════════════
No. 09-0794
════════════
 
LTTS Charter School, Inc. 
d/b/a Universal Academy, Petitioner,
 
v.
 
C2 Construction, Inc., 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fifth 
District of Texas
════════════════════════════════════════════════════
 
 
Argued December 7, 2010
 
 
            
Justice Willett delivered the 
opinion of the Court, in which Justice 
Hecht, Justice Wainwright, Justice Green, Justice Johnson, and Justice Lehrmann 
joined.
                                                                                                            

            
Justice Guzman delivered a 
dissenting opinion, in which Chief 
Justice Jefferson and Justice 
Medina joined.
                                                                        

 
            
Since 1995, open-enrollment charter schools have been a part of the Texas 
public-school system. These nontraditional public schools, created and governed 
by Chapter 12 of the Education Code, receive government funding and comply with 
the state’s testing and accountability system, but they operate with greater 
flexibility than traditional public schools, in hopes of spurring innovation and 
improving student achievement.
            
This interlocutory appeal poses a narrow issue: Is an open-enrollment 
charter school a “governmental unit” as defined in Section 101.001(3)(D) of the 
Tort Claims Act[1] and thus able to take an interlocutory 
appeal from a trial court’s denial of its plea to the jurisdiction?[2] We answer yes. An open-enrollment charter 
school qualifies under the Tort Claims Act as an “institution, agency, or organ 
of government” deriving its status and authority from legislative enactments.[3] Accordingly, it may bring an 
interlocutory appeal. We reverse the court of appeals’ judgment dismissing the 
interlocutory appeal for lack of jurisdiction and remand to that court to reach 
the merits of the school’s immunity claim.
I. 
Background
            
LTTS Charter School, Inc., d/b/a Universal Academy, is an open-enrollment 
charter school that retained C2 Construction, Inc. to build school facilities at 
a site Universal Academy had leased. C2 filed a breach-of-contract suit, and 
Universal Academy filed a plea to the jurisdiction claiming immunity from suit. 
The trial court denied the plea, and Universal Academy brought an interlocutory 
appeal under Section 51.014(a)(8) of the Civil Practice and Remedies Code. In 
the court of appeals, C2 moved to dismiss the interlocutory appeal, arguing 
Universal Academy was not entitled to one because it is not a “governmental 
unit” under the Tort Claims Act.[4] The court of appeals agreed and dismissed 
the interlocutory appeal.[5]
            
We granted Universal Academy’s petition for review to address whether the 
court of appeals properly dismissed the interlocutory appeal. Regardless of 
whether we have jurisdiction over the substance of an interlocutory appeal, we 
have jurisdiction to determine whether the court of appeals properly determined 
its own jurisdiction—the only issue raised in the petition and the briefing.[6]
 II. 
Discussion
A. Standard of 
Review
            
A statute’s meaning is a question of law we review de novo.[7] Our goal in construing a statute is to 
honor the Legislature’s expressed intent,[8] and ordinarily the truest manifestation 
of legislative intent is legislative language—the words the Legislature chose.[9] We thus give unambiguous text its 
ordinary meaning, aided by the interpretive context provided by “the surrounding 
statutory landscape.”[10]
B. Statutory 
Provisions
            
Section 51.014(a)(8) permits an appeal of an interlocutory order that 
“grants or denies a plea to the jurisdiction by a governmental unit as that term 
is defined in Section 101.001.”[11] Section 101.001(3) states a four-part 
definition of “governmental unit,” including this broad 
provision:
 
(D) any other institution, agency, or organ of 
government the status and authority of which are derived from the Constitution 
of Texas or from laws passed by the legislature under the constitution.[12]
 
            
Universal Academy argues it qualifies under this catch-all language as an 
“institution, agency, or organ of government” deriving its status and authority 
from statutory enactments.[13] C2 Construction disputes that this 
statutory provision, or any other, bestows “governmental unit” status on 
open-enrollment charter schools.
            
 Our cases “strictly construe Section 51.014(a) as a narrow 
exception to the general rule that only final judgments are appealable.”[14] Today’s decision, however, turns not on 
the “strictness” or “narrowness” of Section 51.014(a) but on a simpler ground: 
whether Universal Academy fits within the Legislature’s broad definition of 
“governmental unit” in Section 101.001(3)(D).[15]
            
We have 
received two amici curiae briefs, both supporting 
Universal Academy, one from the State of Texas (whose views the Court requested) 
and one from the Texas Charter Schools Association. Both amici echo Universal Academy’s contention that it falls 
within Section 101.001(3)(D), and we agree: An open-enrollment charter school 
qualifies as a “governmental unit” under the Tort Claims Act.
C. The “Status 
and Authority” of Open-Enrollment Charter Schools Arise From 
Statute.
            
Open-enrollment charter schools, governed by Chapter 12 of the Education 
Code, are indisputably part of the Texas public-education system. Several 
statutes in the Education Code and elsewhere amply demonstrate that 
open-enrollment charter schools derive their governmental “status and authority” 
from legislative enactments. Capped at 215 statewide,[16] open-enrollment charter schools are one 
of three classes of charter schools created by Chapter 12.[17] These open-enrollment charter schools 
are authorized to “operate in a facility of a commercial or nonprofit entity, an 
eligible entity, or a school district, including a home-rule school 
district.”[18]
            
 Chapter 12 of the Education Code, which authorizes the 
operation of charter schools, seeks to “ensure[] the fiscal and academic 
accountability” of charter holders while still preserving the “innovations of 
charter schools” from excessive regulation.[19] As publicly funded institutions,[20] charter schools are designed to spark 
academic innovation and thus boost student learning.[21] Additionally, charter schools “increase 
the choice of learning opportunities within the public school system,” “create 
professional opportunities that will attract new teachers to the public school 
system,” and “establish a new form of accountability for public 
schools.”[22]
            
As for status, Section 12.105 of the Education Code—titled 
“Status”—statutorily (and categorically) declares open-enrollment charter 
schools to be “part of the public school system of this state.”[23] In addition, Section 11.002 explains 
that charter schools are “created in accordance with the laws of this state” 
and, together with traditional public schools, “have the primary responsibility 
for implementing the state’s system of public 
education . . . .”[24] Moreover, Section 12.1053 confers 
“governmental entity” status, “political subdivision” status, and “local 
government” status on open-enrollment charter schools for purposes of myriad 
public purchasing and contracting laws (like dealings with construction 
companies).[25]
            
As for authority, that too derives from “laws passed by the legislature 
under the constitution.”[26] Several statutes discuss the authority 
that open-enrollment charter schools may exercise under their charters. The most 
explicit grant of authority is Section 12.104(a), which provides that 
open-enrollment charter schools have “the powers granted to [traditional public] 
schools” under Title 2 of the Education Code.[27] The scope of a charter school’s 
authority is further detailed in Section 12.102, titled “Authority Under 
Charter”: An open-enrollment charter school “is governed under the governing 
structure described by the charter” and “retains authority to operate under the 
charter” assuming acceptable student performance.[28] But just as importantly, that section is 
also authority-limiting, itemizing what powers open-enrollment charter schools 
do not possess—namely, broad authority to impose taxes[29] and tuition.[30]
            
Put simply, open-enrollment charter schools wield many of the same powers 
as traditional public schools. They have statutory entitlements to state 
funding[31] and to the same services that school 
districts receive;[32] they are generally subject to “state 
laws and rules governing public schools”;[33] and they are subject to the 
“specifically provided” provisions of and rules adopted under the Education 
Code.[34] Many specific provisions applicable to 
the educational programs of traditional public schools also apply to 
open-enrollment charter schools, including provisions relating to “the Public 
Education Information Management System,” reading instruments and instruction, 
high school graduation, special education, bilingual education, prekindergarten 
programs, health and safety, and “public school accountability.”[35]
            
Chapter 12 further subjects open-enrollment charter schools to a host of 
statutes that govern governmental entities outside the Education Code. For 
example, for purposes of the Government Code’s regulation of open meetings and 
access to public information, “the governing body of an open-enrollment charter 
school [is] considered to be [a] governmental bod[y].”[36] Likewise, for purposes of the Government 
Code’s and Local Government Code’s regulation of government records, “an 
open-enrollment charter school is considered to be a local government” and its 
records “are government records for all purposes under state law.”[37] And lastly, under Section 12.1053, as 
noted above, an open-enrollment charter school is considered to be: (1) a 
“governmental entity” for purposes of Government Code and Local Government Code 
provisions relating to property held in trust and competitive bidding; (2) a 
“political subdivision” for purposes of Government Code provisions on 
procurement of professional services; and (3) a “local government” for purposes 
of Government Code provisions on authorized investments.[38]
            
In sum, numerous provisions of Texas law confer “status” upon and grant 
“authority” to open-enrollment charter schools. Their status as “part of the 
public school system of this state”[39]—and their authority to wield “the powers 
granted to [traditional public] schools”[40] and to receive and spend state tax 
dollars[41] (and in many ways to function as a 
governmental entity[42])—derive wholly from the comprehensive 
statutory regime described above. With this legislative backdrop in mind, we are 
confident that the Legislature considers Universal Academy to be an 
“institution, agency, or organ of government” under the Tort Claims Act[43] and thus entitled to take an 
interlocutory appeal here.[44]
D. Arguments 
Against “Governmental Unit” Status Fall Short.
            
C2 suggests that Universal Academy is not a “governmental unit” because 
it is a private institution and can engage in for-profit activities. This is 
unpersuasive. It is true that open-enrollment charter schools can be operated by 
private institutions or private entities.[45] However, Universal Academy cannot earn 
profits and direct those profits to shareholders as do private for-profit 
corporations, as the statute does not permit private for-profit corporations to 
operate open-enrollment charter schools. In this case, Universal Academy is run 
by a non-profit corporation organized under Texas law and qualifying under 
Section 501(c)(3) of the Internal Revenue Code. As Section 12.101(a) provides, 
this non-profit organization is eligible to operate an open-enrollment charter 
school.[46] The open-enrollment charter granted to 
Universal Academy specifically states that the charter holder “shall take and 
refrain from all acts necessary to be and remain in good standing as an 
organization exempt from taxation under Section 501(c)(3).” Though C2 points out 
that Universal Academy subleased a portion of its facilities to a private 
prekindergarten school that charges tuition, nothing in the record suggests the 
proceeds went to anywhere but the operations of Universal Academy.[47]
            
Further, even though Universal Academy is in some sense a nonpublic 
entity, its activities are narrowly circumscribed by statute. Universal Academy 
has no authority to operate outside of the educational mandate contained in its 
governing statutory framework, its articles of incorporation, and its charter. A 
charter may be granted only if Universal “meets any financial, governing, and 
operational standards adopted by the commissioner under” Subchapter D of Chapter 
12,[4][8] the subchapter governing open-enrollment 
charter schools. The Commissioner of Education may audit Universal 
Academy[49] and may revoke its charter for failure 
to satisfy generally accepted accounting standards of fiscal management or for 
failure to comply with its charter or Subchapter D.[50] Like all other open-enrollment charter 
schools, Universal Academy is required by law to “provide instruction to 
students at one or more elementary or secondary grade levels as provided by the 
charter.”[51] Further, Universal Academy’s articles of 
incorporation state that “[t]he corporation is organized exclusively for the 
following purpose: the non profit operation of an 
open-enrollment charter school which shall be operated for educational 
purposes.”
            
Universal Academy’s use of state-funded property and state funds is also 
carefully circumscribed. Property purchased or leased with state public 
funds—the source of more than 93% of Universal Academy’s funding—is held in 
trust for the benefit of the students[52] and “may be used only for a purpose for 
which a school district may use school district property.”[53] In other words, if traditional public 
schools can rent their facilities to private groups—like to churches for Sunday 
services or to dance studios for ballet recitals—then so can charter 
schools.[54] Likewise, open-enrollment charter 
schools may spend state funds only in the manner that public schools may spend 
such funds,[55] and such funds are also held in trust 
for the benefit of the students.[56]
            
The dissent, however, maintains that Universal Academy lacks 
“governmental unit” status because, while the overall charter-school regime is 
set forth by statute, it is the State Board of Education (SBOE) that issues 
charters and the Commissioner of Education who revokes or denies 
renewal.[57] That is, the dissent views 
open-enrollment charter schools as creatures of a state agency, not the state 
legislature.[58] Because “specific charter schools 
are not mentioned”—one by one—in statute, “they therefore do not derive status 
as governmental units” under Section 101.001(3)(D) of the Tort Claims 
Act.[59] In other words, unless and until our 
biennial Legislature passes statutes that identify each open-enrollment charter 
school by name, a school can never achieve “governmental unit” status under 
Subsection (3)(D).[60] This argument is textually 
untenable.
            
True enough, a charter school cannot operate without a charter. And 
charters are granted by the SBOE, not by 181 legislators sifting through mounds 
of applications.[61] But that does not mean a charter 
school’s status and authority derive from administrative as opposed to 
legislative action. The dispositive issue is not who grants a charter but who 
grants a charter meaning. Who bestows the status and authority that a 
charter brings; what does having a charter mean, and who says so? The wellspring 
of open-enrollment charter schools’ existence and legitimacy is the Education 
Code and its multiplicity of provisions that both detail and delimit what these 
public schools can and cannot do. The SBOE can issue no charters absent the 
Education Code,[62] which dictates the requirements for 
charter eligibility[63] and details with precision what powers 
are conferred.[64] The “powers” of an open-enrollment 
charter school derive from statute;[65] likewise its “authority to operate under 
the charter”[66] (along with limitations upon that 
authority[67]); same for its “[s]tatus.”[68] All emanate from legislative command. 
The Legislature has tasked the SBOE and the Texas Education Agency with certain 
day-to-day duties, but the fact that non-legislators have been delegated such 
tasks does not obscure the all-encompassing legislative regime that called 
charter schools into existence and that defines their role in our 
public-education system.[69] The Legislature’s own pronouncements 
declare the status and authority of open-enrollment charter schools. Other state 
entities and officials may exercise a measure of oversight pursuant to those 
statutory commands, but the commands themselves, and that they are legislative, 
are what matter most.
III. 
Conclusion
            
Open-enrollment charter schools are governmental units for Tort Claims 
Act purposes because: (1) The Act defines “governmental unit” broadly to include 
“any other institution, agency, or organ of government” derived from state 
law;[70] (2) the Education Code defines 
open-enrollment charter schools as “part of the public school system,”[71] which are “created in accordance with 
the laws of this state,”[72] subject to “state laws and rules 
governing public schools,”[73] and, together with traditional public 
schools, “hav[ing] the 
primary responsibility for implementing the state’s system of public 
education;”[74] and (3) the Legislature considers 
open-enrollment charter schools to be “governmental entit[ies]”[75] under a host of other laws outside the 
Education Code.
            
Accordingly, because Universal Academy is a “governmental unit” under the 
Tort Claims Act, the court of appeals had jurisdiction to hear Universal 
Academy’s interlocutory appeal under Section 51.014(a)(8).[76] Our holding does not resolve the 
underlying issue of whether Universal Academy enjoys immunity from C2’s contract 
claim. We reverse the court of appeals’ judgment dismissing the appeal and 
remand to that court for further proceedings.
                                                                                                

                                                                                                
_______________________________
                                                                                                
Don R. Willett                                    

Justice
 
OPINION DELIVERED: June 17, 2011







[1] See 
Tex. Civ. Prac. & Rem. Code 
§ 101.001(3)(D).

[2] Id. § 
51.014(a)(8) (permitting an appeal from an interlocutory order of a district 
court order that “grants or denies a plea to the jurisdiction by a governmental 
unit as that term is defined in Section 101.001”).

[3] See 
id. § 
101.001(3)(D).

[4] 288 S.W.3d 31, 
32.

[5] Id. at 
38.

[6] See Klein 
v. Hernandez, 315 S.W.3d 1, 3 (Tex. 2010).

[7] See First 
Am. Title Ins. Co. v. Combs, 258 S.W.3d 627, 631 (Tex. 
2008).

[8] See City of 
DeSoto v. White, 288 S.W.3d 389, 394 (Tex. 
2009).

[9] See Alex 
Sheshunoff Mgmt. Servs., 
L.P. v. Johnson, 209 S.W.3d 644, 651 (Tex. 
2006).

[10] See 
Presidio Ind. Sch. Dist. v. Scott, 309 S.W.3d 927, 929–30 (Tex. 
2010).

[11] Tex. Civ. Prac. & Rem. Code § 
51.014(a)(8).

[12] Id. § 
101.001(3)(D).

[13] Universal 
Academy also argues it qualifies for “governmental unit” status as a “political 
subdivision” under Section 101.001(3)(B), specifically as a “school district.” 
See id. § 101.001(3)(B). We need not discuss Subsection (3)(B) since 
we hold that open-enrollment charters fall under Subsection 
(3)(D).

[14] See, 
e.g., Tex. A&M Univ. Sys. v. Koseoglu, 
233 S.W.3d 835, 841 (Tex. 2007) (quotations and citation 
omitted).

[15] Tex. Civ. Prac. & Rem. Code § 
101.001(3)(D).

[16] Tex. Educ. Code § 
12.101.

[17] Id. § 
12.002 (stating that the three classes of charter schools are: “(1) a home-rule 
school district charter . . . ; (2) a campus or campus program 
charter . . . ; or (3) an open-enrollment 
charter . . . .”); see id. § 12.011 (describing the 
“[a]uthorization” for and “[s]tatus” of home-rule school district charter schools); see 
id. § 12.052 (describing the “[a]uthorization” for campus or campus program charter 
schools); see id. § 12.101 (describing the “[a]uthorization” for open-enrollment charter schools); see 
id. § 12.105 (describing the 
“[s]tatus” of open-enrollment charter 
schools).

[18] Id. § 
12.101.

[19] Id. § 
12.001(b).

[20] Id. § 
12.106(a) (A charter holder is entitled to receive funding for the 
open-enrollment charter school that is based in part on student “weighted daily 
attendance” and on “the state average tax effort.”); id. § 12.106(b) 
(“An open-enrollment charter school is entitled to funds that are available to 
school districts from the agency or the commissioner in the form of grants 
or other discretionary funding unless the statute authorizing the funding 
explicitly provides that open-enrollment charter schools are not entitled to the 
funding.”); see id. § 12.106(c) (“The commissioner may adopt rules 
to provide and account for state funding of open-enrollment charter schools 
under this section.”).

[21] See 
id. § 
12.001(a).

[22] 
Id.

[23] Id. § 
12.105.

[24] Id. § 
11.002.

[25] See 
id. § 12.1053.

[26] Tex. Civ. Prac. & Rem. Code § 
101.001(3)(D).

[27] Tex. Educ. Code § 
12.104(a).

[28] Id. § 
12.102.

[29] Id. § 
12.102(4) (An open-enrollment charter school “does not have authority to impose 
taxes.”).

[30] Id. § 
12.108(a) (“An open-enrollment charter school may not charge tuition to an 
eligible student who applies under Section 12.117.”).

[31] Id. § 
12.106(a) (“A charter holder is entitled to receive for the open-enrollment 
charter school funding under Chapter 42 . . . .”).

[32] Id. § 
12.104(c) (“An open-enrollment charter school is entitled to the same level of 
services provided to school districts by regional education service 
centers.”).

[33] Id. § 
12.103(a).

[34] Id. § 
12.103(b).

[35] Id. § 
12.104.

[36] Id. § 
12.1051.

[37] Id. § 
12.1052.

[38] See 
id. § 12.1053.

[39] Id. § 
12.105.

[40] Id. § 
12.104(a).

[41] See 
id. §§ 12.106, .107.

[42] See 
id. § 12.1053.

[43] See 
Tex. Civ. Prac. & Rem. Code § 
101.001(3)(D).

[44] We leave 
undecided the separate issue of whether Universal Academy is immune from suit. 
The Solicitor General of Texas—responding to our request for briefing from the 
State—contends that denying “governmental unit” status “would make little sense 
because the Legislature has expressly granted open-enrollment charter schools 
immunity from liability.” It is true that Section 12.1056 of the Education Code, 
while not mentioning immunity from suit, specifies that open-enrollment charter 
shools are “immune from liability to the same extent 
as a school district.” Tex. Educ. 
Code § 12.1056. Our holding today that Universal Academy is a 
“governmental unit” under the Tort Claims Act entitled to take an interlocutory 
appeal does not turn on Section 12.1056’s mention of immunity from liability. 
While that provision, like several other Education Code provisions, implies 
legislative recognition of “governmental unit” status for open-enrollment 
charter schools, we reserve judgment on: (1) whether Universal Academy, while 
entitled to take an interlocutory appeal, also has immunity from suit; and more 
fundamentally (2) whether the Legislature in fact has the authority to confer 
(as opposed to waive) immunity, a common-law creature traditionally delimited by 
the judiciary. That said, the Solicitor General pivots on Section 12.1056’s 
grant of immunity from liability to argue that if open-enrollment charter 
schools are not governmental units under the Tort Claims Act, then the 
Act does not apply. And if the Act does not apply, then an open-enrollment 
charter school’s immunity from tort liability is never waived. And if immunity 
is never waived, then Section 12.1056 would suggest that open-enrollment charter 
schools are immune from all tort liability, unique among all governmental 
entities in the State. The Solicitor General sees this as an illogical and 
surely unintended outcome—traditional public schools exposed to tort liability 
but charter schools exempt from it. We do not consider today the scope or effect 
of Section 12.1056, but assuming arguendo the 
Legislature can grant immunity from liability, it would seem odd for lawmakers 
to imbue open-enrollment charter schools with greater tort immunity than cities, 
counties, school districts, and other purely governmental entities. Again, we 
reserve judgment on Universal’s immunity from suit, an issue not before 
us.

[45] See 
Tex. Educ. 
Code § 12.101(a). Open-enrollment charter 
schools may be operated by any one of four eligible entities: a public 
institution of higher education, a governmental entity, a private or independent 
institution of higher education, or, in this case, a non-profit organization. 
Id.
 

[46] See 
id. § 12.101(a)(3).

[47] Further, more 
than 93% of Universal Academy’s funding comes from the State of Texas, through 
per-pupil allotments similar to allotments paid to public independent school 
districts. See id. § 12.106. Universal Academy also receives 
federal funding and private donations, so the revenue from the sublease 
generates only a minuscule portion of Universal Academy’s 
revenues.

[48] Id. § 
12.101(b); see also id. § 12.113(a)(1).

[49] Id. § 
12.1163(a)(1). The Commissioner also has the power to audit the records of the 
charter holder and any management company that provides management services to 
the school. See id. §§ 12.1163(a)(1)–(2), .1012.

[50] Id. § 
12.115. Whether Universal Academy complied with statutory accountability and 
financial standards is not before us today.

[51] Id. § 
12.102(1).

[52] Id. § 
12.128(a)(2).

[53] Id. § 
12.128(a)(3).

[54] See 
id.; see also id. § 45.033. Under Chapter 45, which covers school 
district funding, the governing board of a school district “may set and collect 
rentals, rates, and charges from students and others for the occupancy or use of 
any of the facilities, in the amounts and manner determined by the board 
. . . .”

[55]
Id. § 
12.107(a)(3).

[56] Id. § 
12.107(a)(2).

[57] __ S.W.3d __, 
__.

[58] Id. at 
__.

[59] Id. at 
__.

[60] Id. at 
__. The dissent sees two narrow paths to “governmental unit” status for 
privately run open-enrollment charter schools: (1) under Subsection (3)(B), if 
such schools are added as a general category of “political subdivision” like 
junior college districts, or (2) under Subsection (3)(D), if each school has its 
existence statutorily declared, like each of our State’s various public 
universities. Id. As explained above, this constrained view lacks any 
textual support, and we decline to graft this ancillary requirement onto the 
Legislature’s straightforward definition of “governmental unit” in Subsection 
(3)(D).

[61] Tex. Educ. Code § 12.101 (providing 
that the SBOE “may grant a charter for an open-enrollment charter school only to 
an applicant that meets any financial, governing, and operational standards 
adopted by the commissioner”).

[62] Id. § 
12.113.

[63] Id. § 
12.101(a).

[64] See 
id. § 12.102 (titled “Authority Under Charter”). The Education Code is the 
authority for these charter agreements; it defines the scope of their content 
and limits their effect on future renewals. Section 12.111, titled “Content,” 
says that “each charter granted under this subchapter must” include, among other 
things, the period of the charter’s validity, the conditional nature of its 
renewal, the minimum level of student performance, and the basis for revoking a 
charter. Id. § 12.111. Furthermore, “[t]he grant of a charter 
under [Subchapter D] does not create an entitlement to a renewal of a charter on 
the same terms as it was originally issued.” Id. 
§ 12.113(b).

[65] Id. § 
12.104(a) (Open-enrollment charter schools have “the powers granted to 
[traditional public] schools” under Title 2 of the Education 
Code.).

[66] Id. § 
12.102(3).

[67] See 
id. § 12.102(4) (An open-enrollment charter school “does not have authority 
to impose taxes.”); see also id. § 12.108(a) (“An open-enrollment 
charter school may not charge tuition to an eligible student who applies under 
Section 12.117.”).

[68] Id. 
§ 12.105 (titled 
“Status”).

[69] Edgewood 
Indep. Sch. Dist. v. Meno, 917 S.W.2d 717, 730 n.8 (Tex. 1995) (“As long as 
the Legislature establishes a suitable regime that provides for a general 
diffusion of knowledge, the Legislature may decide whether the regime should be 
administered by a state agency, by the districts themselves, or by any other 
means.”).

[70] See 
Tex. Civ. Prac. & Rem. Code 
§ 101.001(3)(D).

[71] Tex. Educ. Code § 
12.105.

[72] Id. § 
11.002.

[73] Id. § 
12.103(a).

[74] Id. § 
11.002.

[75] Id. § 
12.1053; see also id. §§ 12.1051–.1052.

[76] 
See Tex. Civ. Prac. & Rem. 
Code § 51.014(a)(8).